**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Clifford BAPTISTE, Christopher Frank, LeShawn Parker, Garion McCoy, Brian Anthony Jones, Percy Franklin and Rico Schexnayder Defendants–Appellants,**

**No. 99–31027.**

United States Court of Appeals,
Fifth Circuit.

Aug. 31, 2001.

---

Robert J. Boitmann, Asst. U.S. Atty. (argued), Stephen A. Higginson, Asst. U.S. Atty., New Orleans, LA, for Plaintiff–Appellee.

Dane S. Ciolino (argued), Loyola Law School, New Orleans, LA, for Baptiste.

Birch P. McDonough, McDonough & McDonough, New Orleans, LA, for Frank.

John H. Craft, Asst. Fed. Pub. Def. (argued), New Orleans, LA, for Parker.

Archie B. Creech (argued), Law Office of Salvador Anzelmo, New Orleans, LA, for McCoy.

Edwin Rene Murray, Murray, Darnell & Williams, New Orleans, LA, for Jones.

Laurie Anne White (argued), New Orleans, LA, for Franklin.

George Chaney, Jr. (argued), Gina Marie Recasner, Chaney & Recasner, New Orleans, LA, for Schexnayder.

Before KING, Chief Judge, and REAVLEY and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellants Clifford Baptiste, Christopher Frank, Percy Franklin, Brian Jones, LeShawn Parker, Garion McCoy, and Rico Schexnayder challenge their convictions for firearm and drug-related crimes. We affirm their convictions, but, applying this circuit's interpretation of *Apprendi v. New Jersey*, reverse their sentences and remand for resentencing.[1]

## I. FACTS

Following a rash of shootings and drug arrests in the Seventh Ward of New Orleans between 1991 and 1998, a federal grand jury charged the appellants in an eighteen-count superseding indictment[2] with conspiracy to distribute crack cocaine, using firearms during and in relation to drug trafficking crimes, and possessing firearms after being convicted of felonies.[3] The indictment did not allege the quantity of drugs involved in the conspiracy. After the severance of one defendant eliminated one count, the appellants were tried together on the remaining seventeen counts in May 1999.

### A. Evidence related to count 1 (conspiracy to distribute crack).

The government presented evidence at trial that an "open air drug market" existed in the Seventh Ward beginning in the early 1990s. Witnesses testified that a group of crack dealers sold drugs near the intersection of Dorgenois and Lapeyrouse streets (the "Dorgenois Group"). Witnesses identified all of the appellants except Garion McCoy as crack dealers associated with this group. Although no witnesses saw McCoy selling crack,

---

1. Judge Reavley concurs in the judgment only.

2. The original indictment charged the use of firearms during and in relation to crimes of violence, but these counts were replaced by the charges covering firearms use during and in relation to drug trafficking.

3. The counts fell under the following statutes: conspiracy to distribute crack cocaine, 21 U.S.C. § 841(a)(1), 846; using or carrying firearms during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1); possession of firearms by a felon, 18 U.S.C. §§ 922(g)(1), 924(a)(2).

McCoy reportedly associated with group members in the area.

Witnesses testified that another group of crack dealers sold drugs near the intersection of Rocheblave and Laharpe streets (the "Rocheblave Group"). This group included Troy Harris, Earl Charles, and cousins of the Enclarde family. A government witness associated with this group testified that the members bought drugs as individuals and did not collude to sell drugs.

Baptiste and Jones led the Dorgenois Group. Jones brought most of the crack into the neighborhood and sold it to other members. Baptiste was "almost on the same level with Brian Jones," and also provided drugs for the group. Members of the Dorgenois Group styled themselves as the "Seventh Ward Hardheads" or the "Seventh Ward Soldiers." McCoy bragged to Davis LeBouef, a fellow inmate, in 1998 that he dealt heroin and crack with a gang that called itself the "Seventh Ward Soldiers." The government presented letters that Frank had received referring to "hardheads," "soljuas," and "7th Ward Soljuas." One of these letters was from Parker.

The government initially charged Adonis Thompkins for conspiring with the appellants, but it allowed him to plead guilty to misprision in exchange for testimony against the appellants. Thompkins testified at trial that all of the appellants except McCoy sold crack. He knew this because "[w]e all sold drugs together, you know." Thompkins further testified, however, that he considered himself an independent actor who sought to purchase drugs at the lowest price. Thompkins was supplied by Baptiste, Jones, and Schexnayder, as well as by Troy Harris of the Rocheblave Group. In bad weeks, he sold an ounce of crack. He said that he did not know of a Seventh Ward Soldiers organization. Thompkins believed that Schexnayder sold drugs for his own personal benefit.

Thomas Enclarde, a member of the Rocheblave Group, testified that he purchased drugs from Baptiste fifteen to twenty times. He testified that he purchased drugs from Jones eight to ten times, typically in $50 or $250 increments, but at times in quantities of about an ounce.

Earl Charles, another member of the Rocheblave Group, testified that Baptiste, Jones, and Schexnayder sold "halfs" (one-half of an ounce of cocaine base, or approximately 14.1 grams) and "quarters," while Frank, Franklin, and Parker sold crack in smaller "rocks."

Police officers testified that they arrested the appellants for numerous drug and weapons offenses during the period of the alleged conspiracy. Nearly all of these arrests occurred in a twelve square block area. An officer arrested Schexnayder as he attempted to sell several pieces of crack in August 1991. Another officer arrested Baptiste and an unidentified person in May 1992, seizing a handgun, $230 cash, and thirteen rocks of crack. An officer arrested Baptiste again in August 1992 and seized two handguns and a bag of crack.

A police officer arrested Frank for possession of five pieces of crack in May 1995. In September 1995, Franklin stopped an unidentified person from selling crack to an undercover agent. The agent arrested Franklin with four pieces of crack.

An officer chased Schexnayder's vehicle and arrested him in November 1996. The officer recovered $1200, a gun, and twenty-nine individually wrapped rocks of crack. The officer testified that drug dealers commonly wrapped crack in this fashion for sale. The district court rejected an objec-

tion by Schexnayder's attorney that these statements were "beyond the scope" of the officer's testimony about the incident.

In March 1997, the police arrested Franklin for possession of a pistol and ammunition. The next month, an officer heard shots and arrested Parker after observing him with a gun in his hand.

An officer chased Frank after seeing him participate in a drug sale in May 1997. The officer recovered a bag of cocaine, $120, and ammunition after arresting him. Also that month, officers caught Schexnayder and another man purchasing drugs. The police recovered seven pieces of crack and $1300 from them. In June 1997, when the police arrested Parker and another man, they found a rock of crack, a marijuana cigarette, and $438 in an envelope with Parker's name on it.

In August 1997, an officer found Thompkins with McCoy. Thompkins had $140 and a rock of crack hidden in his shoe, but a search of McCoy produced nothing, and the officer released him.

Police officers searched the homes of several of the appellants between 1997 and 1998. In December 1997, they seized a sawed-off shotgun, an assault rifle, a .357 pistol, and bags of AK–47 ammunition from Parker's house. Several months later, a second search of Parker's house produced twenty-nine shotgun shells.

In May 1998, officers found a pistol, a balance scale, two bags of AK–47 ammunition, and $36,000 in cash at Jones's house. Jones initially disclaimed the money, but then asserted that the cash was from the recent sale of two vans. Jones admitted at trial that at the time of the search, he could not recall the purchasers of the vehicles. He testified that he did not give the purchasers title to the vans because his business owned the vehicles.

At trial, the government introduced six firearms into evidence. These firearms were not connected to the charged firearms offenses, though they were seized from appellants' possession during the course of the investigation. Defense attorneys did not object to this evidence.

*B. Evidence related to the §§ 924(c)(1) and 922(g)(1)/924(a)(1) counts.*[4]

Witnesses testified that the Dorgenois and Rocheblave groups coexisted peacefully until 1994. On or about January 5, 1994, however, Michael Enclarde of the Rocheblave Group killed Kevin Hall and Terrance Green. Green and Hall were "close" to Baptiste and Jones, and their names appeared under "R.I.P." in several of the "Seventh Ward Soldiers" letters that Frank received. A witness testified that an angry Baptiste inspected the scene of Green's and Hall's deaths.

1. *Evidence related to Count 2 (using/carrying a firearm in relation to a drug crime) and Count 3 (possession of a firearm by a felon).*

Some of the appellants went on a series of shooting sprees against members of the Rocheblave Group beginning January 6, 1994. Baptiste and Jones drove up to and repeatedly shot at a minivan containing Harris, Charles, and Leonard Phillips. Jones was wielding an SKS rifle, an assault rifle similar to an AK–47.

2. *Evidence related to Count 5 (using/carrying a firearm in relation to a drug crime).*

Jones, armed with a gun, chased Michael Enclarde into a store that same afternoon. Witnesses heard shots and then saw Jones emerge. Thomas Enclarde

---

**4.** The evidence is recited only for those counts that resulted in convictions.

went into the store and found Michael Enclarde's body. Jones later said that he shot Michael Enclarde for killing Jones's friends.

3. *Evidence related to Count 6 (using/carrying a firearm in relation to a drug crime) and Count 7 (possession of a firearm by a felon).*

Thompkins testified that Baptiste and Jernard Lewis[5] approached him on February 22, 1996 looking for members of the Enclarde family. Thompkins heard shots a few minutes later and saw Lewis running. Dale Womack, a cousin of the Enclardes, saw Baptiste and an unidentified man stand over Joseph Enclarde and shoot him to death.

4. *Evidence related to Count 8 (using/carrying a firearm in relation to a drug crime) and Count 9 (possession of a firearm by a felon).*

Womack's mother testified that on July 12, 1996, Baptiste and two other men came to her house looking for Phillip Enclarde. Dale Womack dropped Phillip Enclarde off at a street corner that night and drove to a nearby gas station with Thomas Enclarde. Womack heard shots and saw Baptiste chasing Phillip.

Thomas Enclarde testified, however, that he was with Womack the entire time and did not hear shots. He testified that the police were already present when he and Womack arrived at the scene of the shooting.

A police officer arrived on the scene within three minutes of receiving a call about the shots and found Phillip Enclarde lying on the ground. Enclarde was bleeding badly and in pain. The officer asked Enclarde to identify his assailant and En-

clarde reportedly made statements identifying Baptiste. A defense witness disputed the officer's testimony. She claimed that Enclarde was moving his legs in discomfort, but said that he was "very calm," and did not identify a shooter. Nevertheless, Phillip Enclarde died from his wounds later that night. Over Baptiste's objection, the district court admitted Enclarde's statements to the officer as excited utterances.

5. *Evidence related to Count 10 (using/carrying a firearm in relation to a drug crime) and Count 11 (possession of a firearm by a felon).*

Dale Womack and Thomas Enclarde testified that Baptiste, Frank, Jones, and Parker blocked their car and fired shots at them on August 14, 1996. Frank and Parker later admitted to Thompkins that they had been in a firefight with Womack and Enclarde.

6. *Evidence related to Count 12 (using/carrying a firearm in relation to a drug crime) and Count 13 (possession of a firearm by a felon).*

Leshara El–Amin testified that she saw convicted conspiracy member Jernard Lewis and several other men kill one of her friends in early 1997. One of the men in the car threatened to kill her if she spoke to the police. El–Amin told the police about the shooting anyway and ultimately testified before the grand jury that indicted Lewis.

Parker approached El–Amin on December 22, 1997, and asked her to meet him at Thompkins's house. El–Amin walked instead toward her sister's house. Thompkins and Frank intercepted her, and Frank shot her, leaving her paralyzed. A police

---

**5.** The government initially indicted Lewis with the appellants. For scheduling reasons, he received a separate trial and a jury convicted him of conspiracy to distribute crack.

officer testified that El–Amin identified Frank, Parker, and Thompkins in a photo lineup following the shooting.

Thompkins confirmed El–Amin's account. Thompkins testified that Trevor Williams, an alleged member of the conspiracy, offered him nine ounces of cocaine to kill El–Amin to keep her from testifying against Lewis. After the shooting, Williams gave him only half of the promised cocaine to share with Frank and another participant.

### 7. *Evidence related to Count 16 (using/carrying a firearm in relation to a drug crime).*

An assailant shot and killed Fatima Walters, El–Amin's sister, in the Seventh Ward on April 30, 1998. A police officer testified that he found a bicycle lying next to Walters's body.

Prisoner Davis LeBouef recounted statements McCoy made while the two were in a New Orleans jail in 1998. LeBouef, though not tied to the alleged conspiracy, was already acquainted with McCoy at the time of their prison conversations. McCoy admitted that he shot Walters in retaliation for El–Amin's testimony against the Seventh Ward Soldiers. McCoy also stated that Walters was riding a bicycle at the time.

### C. The defense.

Defense attorneys cross-examined government witnesses about various inconsistencies between their testimony and their initial reports to police. They also presented several alibi witnesses asserting that some of the appellants could not have been involved in the shootings. McCoy's attorney questioned LeBouef about his access in prison to other sources of information about the Walters killing.

An attorney testified that Harris, Charles and Phillips came to his office about a month after the January 6, 1994 shooting attack on their minivan. Baptiste's uncle was reportedly with the three. The attorney testified that Harris, Charles, and Phillips each signed affidavits stating that Baptiste was not involved in that shooting. The court admitted Charles's affidavit into evidence.

Jones was the only appellant to testify at trial. He denied that a conspiracy existed. He also denied involvement in the shootings. He testified that while he did not know McCoy, he had known the other appellants for many years. Jones testified that he had never seen any of the appellants with drugs or guns.

Jones testified that he had once owned an AK–47. He claimed, however, that he gave the rifle to his uncle several days before the shooting of Troy Harris's van. Jones's uncle testified that he drove across a bridge a few days later and threw the rifle across the opposite lane into Lake Pontchartrain while moving at fifteen miles per hour.

### D. Closing arguments.

The district court introduced the closing arguments with the following instruction:

> Closing arguments are not evidence, merely a discussion and presentation of the facts that were in evidence in the light most favorable to the Government by the Government, and to the Defendants by the Defendants, so if you'll please give them your attention.

During the arguments, McCoy's attorney asked the jury to discredit LeBouef's account of McCoy's alleged statements. The attorney mentioned the victim of an armed robbery that LeBouef had been involved in, and urged the jury to "send a message to this Government. We don't want that maniac [LeBouef] on the street."

He warned the jury not to "let McCoy get lost in the shuffle."

The prosecutor made the following statements in her rebuttal:

> That's right, I agree wholeheartedly. Don't let Garion McCoy get lost in the shuffle. Because if he walks out of here, I guarantee you he will arm himself with a gun. He will go back out on the street and he will shoot again and he will kill again, as will every other one of these Defendants that are charged with shootings and charged with murders should they walk out of this courtroom.

The appellants did not immediately object to these statements. After closing arguments were complete and the jury had retired for the night, Franklin, McCoy, Parker, and Schexnayder moved for a mistrial based on these statements. The district court denied the motions.

The next morning, the court made the following statements in its instructions to the jury:

> The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case and, in so doing, to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in this case. What the lawyers say is not binding upon you.

The district court did not instruct the jury to determine the quantity of drugs that the appellants were responsible for.

*E. The convictions and sentences.*

Baptiste was convicted on Counts 1, 2, 3, 6, 7, 8, 9, 10, and 11. Frank was convicted on Counts 1, 12, and 13. Franklin was convicted on Count 1 only. Jones was convicted on Counts 1, 2, 5, and 10. McCoy was convicted on Counts 1, 16, and 17. Parker was convicted on Counts 1, 10, and 12. Schexnayder was convicted of Count 1 only. The jury acquitted one co-defendant entirely, and acquitted some of the appellants on certain counts.

Franklin received a 240 month sentence for his conspiracy conviction. The other appellants received life sentences for their conspiracy convictions. The appellants also received supervised release terms of five to ten years based on those convictions.

The appellants convicted of the firearms counts received varying sentences. Baptiste, Jones and Parker received consecutive sentences for their separate § 924(c)(1) convictions.

The appellants now appeal on numerous grounds.[6]

## II. DISCUSSION

*A. The evidence supported the appellants' convictions.*

1. *There was sufficient evidence of a drug conspiracy.*

All of the appellants assert that because the government failed to establish a drug conspiracy, the district court should have granted their motions for acquittal under Fed. R.Crim. Proc. 29. We review the denial of these motions de novo, applying the same standard as the district court.

**6.** Each appellant adopted the arguments of the other appellants by reference. FRAP 28(i) permits appellants to do so for challenges that are not fact-specific as to a particular defendant. *United States v. Alix,* 86 F.3d 429, 434,

n. 2 (5th Cir.1996). Sufficiency of the evidence challenges are fact-specific, so we will not allow the appellants to adopt those arguments. *Id.*

*United States v. Ferguson,* 211 F.3d 878, 882 (5th Cir.2000). The question is whether, viewing the evidence in the light most favorable to the verdict, any rational jury could have found that the crimes were proven beyond a reasonable doubt.

A drug conspiracy requires proof that 1) an agreement existed to violate drug laws; 2) the appellants knew of the agreement; and 3) the appellants voluntarily participated in it. *United States v. Morgan,* 117 F.3d 849, 853 (5th Cir.1997). A jury may infer these elements from circumstantial evidence. *Id.* While mere association with conspirators is insufficient to prove knowing participation in an agreement, it may combine with other circumstantial evidence to support a conspiracy conviction. *United States v. Cortinas,* 142 F.3d 242, 249 (5th Cir.1998).

The appellants argue that the government failed to satisfy the first element because there was no direct evidence of an agreement. At best, the evidence demonstrated that many of them knew each other and sold drugs in the same neighborhood. Although some of them bought drugs from each other, there was no evidence that any of the appellants was "fronting" drugs for others to sell. Indeed, Thompkins testified that he was unaware of any agreement among the appellants.

In *United States v. Brown,* the government presented evidence at trial that three defendants supplied crack to other defendants selling drugs in a small neighborhood. 217 F.3d 247, 254–55 (5th Cir.2000), *remanded on other grounds, Randle v. United States,* 531 U.S. 1136, 121 S.Ct. 1072, 148 L.Ed.2d 950 (2001). This court rejected arguments that the defendants only bought and sold drugs individually. It concluded that the evidence of an "open-air market for crack" was sufficient to support the defendants' conspiracy convic-

tions. *Brown,* 217 F.3d at 255. The court noted that the defendants shared a motive to profit from drug sales, and they depended upon each other because they warned each other of police activity. *Id.* at 254–55.

The evidence in this case is substantially similar to the evidence in *Brown.* The police repeatedly arrested most of the appellants for selling drugs in a small area. Witnesses testified that a few of the appellants provided drugs to the others. Parker interrupted a drug sale to an undercover agent. Thus, there is evidence that the appellants shared a motive to profit from an open air drug market and helped protect each other from the police. This was sufficient to establish an agreement in *Brown.*

There was considerable other evidence of an agreement, moreover. Witnesses testified that the appellants were one of two groups of drug dealers operating in the area. Some of the appellants styled themselves as "Seventh Ward Hardheads" or "Soljuas;" one of them admitted to membership in a "Seventh Ward Soldiers" drug gang. Finally, many of the appellants responded to the murders of their friends with killing sprees against the rival group of drug dealers. In the face of this evidence, a rational jury could reasonably have found that an agreement existed among the appellants.

The appellants' arguments do not convince us otherwise. Despite Thompkins's asserted ignorance of an agreement, the jury could have discredited this part of his testimony and found from the other evidence that a conspiracy existed. Nor did the government have to establish "fronting" to establish a conspiracy. There is no indication in *Brown* that this court relied on or required evidence of fronting to find a conspiracy. The inquiry is simple: could

the jury reasonably conclude from the circumstantial evidence that an agreement existed among the appellants to distribute drugs? On this record, it could.

There is also sufficient evidence that all of the appellants knew of and participated in this agreement to operate an open-air drug market.[7] Witnesses testified that Frank, Franklin, Parker, and Schexnayder bought drugs from Baptiste or Jones, and that all six men sold drugs on the same street. Baptiste, Frank, Jones, and Parker collaborated in shooting the gang's enemies, reinforcing their complicity in the conspiracy. *United States v. Tolliver*, 61 F.3d 1189, 1214 (5th Cir.1995) (tying defendants to a conspiracy based on their attacks against a rival drug gang).

Finally, Franklin and Schexnayder took actions in the group's interest beyond purchasing drugs from Baptiste and Jones. Franklin stopped a dealer on Dorgenois Street from selling drugs to an undercover agent. Schexnayder acted as a source of drugs for Thompkins, an alleged conspiracy member. Based on the evidence, a jury could reasonably have found all the elements of a conspiracy satisfied with respect to these six appellants.

### 2. *The shootings were "in relation to" drug crimes.*

■ Baptiste, Frank, Jones, and Parker argue that the evidence did not support their respective convictions for using firearms "in relation to" drug crimes. They argue that the government established individual shootings but failed to tie the shootings to the drug conspiracy.

■ To convict the appellants under § 924(c)(1), the government had to prove that they used firearms "during and in relation to" a drug trafficking crime. It had to show that these appellants could have used the weapons to protect or facilitate their drug operation, and that the weapons were in some way connected with drug trafficking. *Tolliver*, 61 F.3d at 1218. This standard is satisfied if the weapons have the potential to facilitate a drug operation. *Id.* The weapons need not be in the immediate proximity of illegal drugs. *Id.* (holding that defendants used weapons "in relation to" a drug conspiracy even though it was not clear that they possessed drugs and weapons simultaneously).

The Fourth Circuit has found the "in relation to" element satisfied in a similar case. In *United States v. Camps*, a defendant argued that he shot at rival drug gang members for reasons unrelated to any drug conspiracy. 32 F.3d 102, 105–06 (4th Cir.1994). The court rejected his argument. It observed that the shootings occurred during the period of the conspiracy and that the defendant was attempting to protect his drug operation from his rivals. The court concluded that this was sufficient evidence to establish the "in relation to" element.

Here, the evidence showed that Baptiste, Jones, Frank, and Parker attacked a rival drug gang during the period of the conspiracy to retaliate for the murders of their friends. These murders and attempted murders had at least the potential to protect the conspiracy and intimidate competitors and witnesses. Thus, the shootings were in relation to a drug crime, and sufficient evidence supported the § 924(c)(1) convictions.

### 3. *Sufficient evidence supported Baptiste's felon in possession of a firearm convictions.*

■ Baptiste argues that no reasonable jury could have convicted him on the

---

**7.** McCoy's conviction for conspiracy will be discussed *infra*, as it rests primarily on his

confession to LeBouef.

felon in possession of a firearm counts.[8] These charges were premised on the same shootings that gave rise to the charges for Baptiste's use of a firearm in relation to illegal drug trafficking. As in his appeal on the latter charges, Baptiste points to the affidavits by Harris, Charles, and Phillips purportedly exonerating him from the van shooting. He also points to inconsistencies in the various witness accounts against him and the alibi testimony of defense witnesses for the other three attacks. These arguments are unavailing. The government presented abundant eyewitness evidence of Baptiste's involvement in each of the attacks. The jury could easily have disregarded the inconsistencies, which were not substantial, and credited the government's witnesses. It was also entitled to discredit the affidavits and the defense witnesses.

### 4. *Sufficient evidence supported McCoy's convictions.*

 McCoy argues that the evidence was insufficient to support his conspiracy and firearms convictions. He contends that the only evidence against him was his presence at Thompkins's arrest and the unreliable account of his statements to Le-Bouef.

McCoy's out-of-court statements, if true, established the elements of his convictions. He admitted to LeBouef the existence of and his membership in a "Seventh Ward Soldiers" drug conspiracy. He admitted that he shot Walters, establishing his guilt for using a firearm in relation to illegal drug trafficking, because the shooting protected conspiracy members and intimidat-

ed the conspiracy's enemies. The admission also established the elements of McCoy's felon in possession of a firearm conviction. Further, independent evidence corroborated McCoy's admissions. His associates were engaged in a drug conspiracy known as the "Seventh Ward Soldiers" or "Seventh Ward Hardheads." McCoy was present when police arrested Thompkins with drugs. Testimony about a bicycle at the scene of Walter's murder corroborates McCoy's statements about that crime. The issue, then, is whether Le-Bouef's account of McCoy's admissions and the evidence supporting it was credible enough for the jury to convict McCoy.

Credibility determinations are within the province of the jury. McCoy's attorney cross-examined LeBouef about his motives for testifying, his access to media accounts about the Seventh Ward Soldiers, and his criminal history. The jury apparently believed that McCoy made most of the admissions, and it was entitled to do so. *Meadows v. Delo*, 99 F.3d 280, 281 (8th Cir.1996) (finding sufficient evidence based primarily on testimony by alleged "junkies offered deals with the State" that they overheard incriminating statements). The care with which the jury sifted the evidence is demonstrated, to McCoy's advantage, in their declining to convict him on Counts 14 and 15 involving the murders of two other people, notwithstanding his alleged admission to LeBouef.

### B. *The evidence of the various murders and attempted murders was not extrinsic to the drug conspiracy.*

 The appellants argue that the evidence of uncharged murders and at-

---

**8.** To establish violations of §§ 922(g)(1)/ 924(a)(2), the government had to prove (1) that the defendant was a convicted felon; (2) that he possessed a firearm in or affecting interstate commerce; and (3) that he knew that he possessed a firearm. *United States v. Ferguson*, 211 F.3d 878, 885 n. 4 (5th Cir.

2000). The first element was satisfied by stipulation as to all of the appellants convicted on these counts. Further, the government presented testimony that no firearms manufacturers mass-produced firearms in Louisiana to establish that the firearms had traveled in interstate commerce.

tempted murders was inadmissible under Fed. Rule of Evid. 404(b). Not only did the government not charge them directly with these acts of violence, but it replaced the original counts in the indictment that alleged the use of firearms in relation to crimes of violence. *See* fn. 1. *supra.* Appellants urge that the evidence of uncharged murders and attempted murders was therefore extrinsic to the drug conspiracy and firearms charges in the final indictment. The district court disagreed, holding that the murders and attempted murders were inextricably intertwined with the firearms charges in the indictment. We review evidentiary rulings for abuse of discretion. *United States v. Morgan,* 117 F.3d 849, 861 (5th Cir.1997).

■■■ Rule 404(b) excludes extrinsic evidence out of "fear that the jury will use evidence that the defendant has, at other times, committed bad acts to convict him of the charged offense." *United States v. Aleman,* 592 F.2d 881, 885 (5th Cir.1979). This fear is not implicated where offenses are uncharged only because the government indicts a defendant for less than all of his actions in a single criminal episode. *Id.* Evidence of uncharged crimes is not extrinsic if it is inextricably intertwined with the evidence of charged offenses, or if it is necessary to complete the story of the crime. *Morgan,* 117 F.3d at 861.

Both of the grounds for admission of uncharged crimes are present here. Evidence of the murders and attempted murders was relevant to prove that the appellants were trying to protect a drug conspiracy. Moreover, there was no reasonable way to divorce the firearms charges from the murders and attempted murders. The evidence of the uncharged conduct was inextricably intertwined with evidence of the charged crimes and necessary to complete the story surrounding the firearms and conspiracy charges.

Rule 404(b) does not apply. *See Morgan,* 117 F.3d at 861 (evidence that a conspirator held a gun to a police officer's head during a drug deal was not extrinsic to drug conspiracy charges); *United States v. Fortenberry,* 971 F.2d 717, 721 (11th Cir.1992) (evidence of a double murder was not extrinsic to felon in possession of a firearm charges).

The argument for inadmissibility of the murders and attempted murders under Fed. Rule Evid. 403 because of their prejudicial effect is also easily rejected. The panels in *Morgan* and *Fortenberry* did not consider similar evidence of uncharged conduct unduly prejudicial. *Morgan,* 117 F.3d at 861; *Fortenberry,* 971 F.2d at 721. Although the evidence of the murders and attempted murders was prejudicial, it was necessary for the jury to understand the brutal nature of the conspiracy. The court did not err in admitting this evidence.

*C. The district court did not abuse its discretion by admitting Phillip Enclarde's statements as excited utterances.*

■■■ Baptiste asserts that the district court should not have admitted Phillip Enclarde's statements identifying Baptiste as his murderer. Baptiste argues that Enclarde's statements were inadmissible hearsay. This court's review is for abuse of discretion.

■■■ Fed. Rule of Evid. 803(2) allows courts to admit hearsay statements if they relate "to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." "The ultimate question is whether the statements were the product of reflective thought or whether they were the result of the startling event." *Webb v. Lane,* 922 F.2d 390, 394 (7th Cir.1991). The amount of time between the startling

event and the hearsay statement, though relevant, is not dispositive. *Id.*

In *Webb*, a defendant tried to exclude statements that a shooting victim made after arriving at an emergency room. The victim, who later died from six gunshot wounds, made statements between one and two hours after the attack. The Seventh Circuit noted that the statements followed an extremely violent experience and that the declarant was still under the stress of the attack. The court held that the fact that the declarant made the statements in response to a police officer's queries, though relevant, did not destroy their spontaneity. The court concluded that the excited utterance exception applied.

This case presents stronger circumstances for admissibility than *Webb*. Enclarde had received multiple gunshot wounds and was lying in a pool of blood at the scene of the attack. Although Baptiste asserts that Enclarde had been lying on the scene for nearly thirty minutes, it is not clear from the trial testimony that even that much time passed. Enclarde died shortly afterward from his injuries. The district court did not abuse its discre-

tion by concluding that Enclarde's statements were admissible excited utterances.

## D. The government's improper closing remarks were harmless error.

The appellants challenge the government counsel's prediction during rebuttal argument that they would "kill again" if the jury failed to convict them.[9] The statements, they assert, prejudiced the jury and led to their conviction.

The government concedes that the remarks were improper. It argues, however, that the statements were not unduly prejudicial because they represented a very small part of the closing argument and merely responded to inappropriate closing arguments by McCoy's counsel.

Although plain error is probably the appropriate standard of review for each appellant,[10] in an abundance of caution, we will not apply that standard and will determine, since counsel's remarks were improper, whether they substantially affected the defendants' rights. *U.S. v. Dorr,* 636 F.2d 117, 120 (5th Cir.1981). Under this standard, we consider 1) the

9. Only Franklin and Jones specifically raised this argument in their briefs. Although this challenge is fact-specific because we must consider the evidence against each defendant to determine prejudice, this court has previously allowed a defendant to adopt a closing argument challenge. *United States v. Rhoden,* 453 F.2d 598, 600 (5th Cir.1972). Thus, we will assume *arguendo* that the appellants may do so in this instance.

10. Only Frank, McCoy, Parker, and Schexnayder objected to the government's rebuttal at trial. It is uncertain whether the remaining appellants can rely on these objections to avoid plain error review. *See United States v. Estrada–Fernandez,* 150 F.3d 491, 495 (5th Cir.1998) (applying plain error review to a defendant that failed to join a co-defendant's objections); *United States v. Harris,* 104 F.3d 1465, 1471 (5th Cir.1997) (holding that the objections of one defendant to jury instruc-

tions did not preserve the appellate rights of other defendants); *United States v. Sanchez–Sotelo,* 8 F.3d 202, 210 (5th Cir.1993) (reviewing for abuse of discretion because the appellant's co-defendant objected at trial).

In addition, the appellants did not raise their objections until after the rebuttal was complete. Whether objections following the conclusion of closing statements are timely enough to avoid plain error review is an open question. *Grizzle v. Travelers Health Network,* 14 F.3d 261, 269 (5th Cir.1994) (applying plain error review after a party made a late objection in a civil case); *United States v. Binker,* 795 F.2d 1218, 1226 (5th Cir.1986) (noting the late objection but apparently looking only for "reversible error"); *United States v. Davis,* 523 F.2d 1265, 1271 (5th Cir.1975) (observing that a late objection "substantially weakened" the appeal).

prejudicial effect of the statements; 2) the effect of any cautionary instructions; and 3) the evidence of each appellant's guilt. *United States v. Vaccaro,* 115 F.3d 1211, 1215 (5th Cir.1997) (finding no prejudice where the prosecutor called the defendants "criminals" during a rebuttal argument). Although "two wrongs [do] not make a right," we may evaluate prejudice by considering whether the government remarks responded to improper defense arguments. *Id.* Furthermore, "[w]e assume that a jury has the common sense to discount the hyperbole of an advocate, discounting the force of the argument." *Id.*

Here, the improper remarks were not unduly prejudicial. They responded to a series of improper statements by McCoy's attorney. They did not directly threaten the jury by personalizing the defendants' future dangerousness, and no external factors magnified their prejudicial effect. Defense counsel were not sufficiently troubled by the brief comments to object until after the jury had retired for the evening, and none of them requested further curative instructions. That the jury acquitted some of the appellants of individual counts and acquitted one defendant entirely strongly suggests lack of prejudice, since the jury must have carefully considered the evidence against each appellant.

The remaining factors confirm that the prosecutor's remarks did not affect the appellants' substantial rights. The district judge warned the jury both before and after closing arguments that the statements of the lawyers were not evidence and did not bind them. There was also enough evidence of each appellant's guilt to dispel any concern that the improper remarks were pivotal to the verdicts. Looking at the trial as a whole, therefore, the improper remarks were harmless error. *Compare United States v. Williams,*

523 F.2d 1203, 1207–09 (5th Cir.1975) (conviction reversed for improper closing argument in tandem with prejudicial pretrial publicity), with *United States v. Cunningham,* 54 F.3d 295, 300 (7th Cir.1995) (no reversible error), and *United States v. Record,* 873 F.2d 1363, 1376 (10th Cir. 1989) (same).

### E. *Apprendi issues.*

■ By hook and crook,[11] all of the appellants contend that their sentences, which, with the exception of Franklin's, call for life imprisonment, exceed the statutory maximum of the drug conspiracy crime of which they were convicted. Their arguments rely on this court's interpretation of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court decision holding that, "other than a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. at 2362–63.

■ In this court, drug trafficking crimes defined in 21 U.S.C. § 841 are governed by *Apprendi* analysis on the theory that the dramatically tiered sentences for increasing quantities of illegal drugs enhance the "core" statutory maximum of § 841(b)(1)(C). *United States v. Doggett,* 230 F.3d 160, 163 (5th Cir.2000). Consequently, the quantity of drugs must be alleged in the indictment and proved to the jury beyond a reasonable doubt if, as here, the government seeks enhanced penalties under § 841(b)(1)(A) or (b)(1)(B). *Id.* at 164–65.

Because *Apprendi* reversed this circuit's previous approach to prosecution and sentencing of § 841 offenses, a number of

---

**11.** Some of the appellants have raised the issue by adoption of the others' briefs.

cases posing *Apprendi* issues have come before us in the year since it was issued. Our approach to those cases has not been fully consistent. An early decision held that, even under the demanding plain error standard, where a defendant never challenged the sufficiency of the indictment or proof of quantity of drugs at trial and thus raised the *Apprendi* problem for the first time on appeal, he was nevertheless entitled to a revised sentence. *United States v. Meshack*, 225 F.3d 556, 578 (5th Cir.2000). A second group of cases held that where the record suggested in any way that the jury implicitly found a quantity of drugs corresponding to an enhanced sentence involved in the crime, plain error review did not allow sentence revision. *United States v. Slaughter*, 238 F.3d 580, 583–84 (5th Cir.2000); *United States v. Green*, 246 F.3d 433, 437 (5th Cir.2001); *United States v. Miranda*, 248 F.3d 434, 445 (5th Cir.2001). A third group of cases has ordered revised sentences *sua sponte*, *i.e.*, where the defendant raised no *Apprendi* issue at trial or before this court on appeal. *United States v. Garcia*, 242 F.3d 593, 599 n. 5 (5th Cir.2001); *United States v. Vasquez–Zamora*, 253 F.3d 211, 214 (5th Cir.2001); *United States v. Gonzalez*, 259 F.3d 355, 359 (5th Cir.2001); *United States v. Longoria*, 259 F.3d 363, 365 (5th Cir. 2001). Finally, a recent decision of this court holds that the "implicit" rationale for vacating and remanding sentences in light of *Apprendi* was the fatal omission of the quantity of drugs, now an element of the drug trafficking crime, from the indictment. *Gonzalez, supra.* If *Gonzalez* is correct, then all the preceding discussions of plain or harmless error were unnecessary under our precedents, where the indictment omitted the element of drug quantity, for such a situation must invariably result in reversible error in the sentence.[12]

The instant case reveals problems arising from these holdings. The indictment alleges defendants' involvement in a conspiracy to traffic in cocaine and cocaine base, but it does not allege the quantity of drugs. The other counts of the indictment involve serious federal firearms offenses, but none of them alleges a quantity of drugs involved in the appellants' trafficking. Further, while the evidence at trial abundantly demonstrated that conspiracy members were selling an ounce of crack cocaine or more every week for several years, the jury was never asked to find a particular quantity of drugs. None of the appellants sought jury instructions on drug quantity. Three appellants objected at sentencing that the element of drug quantity had been neither alleged in the indictment nor specifically submitted to the jury in their case.[13] The rest of the appellants did not preserve *Apprendi* error in the trial court.

Having written its brief before many of our above-cited *Apprendi* decisions were

---

**12.** *See, e.g., United States v. Cabrera–Teran*, 168 F.3d 141, 143 (5th Cir.1999). While *Gonzalez* may have properly interpreted this court's attachment to precision in indictments, *Apprendi* expressly declined to deal with the constitutional implication of the sufficiency of the indictment. 120 S.Ct. at 2356, n. 3.

**13.** For Baptiste, Frank and Schexnayder to be sentenced to life imprisonment, the statute required proof that their drug trafficking crimes involved only five grams or more of cocaine or cocaine base, because the government filed bills of information alleging their prior drug distribution convictions. For Jones, Parker and McCoy, on the other hand, with no history of prior drug trafficking offenses, the government had to prove that the instant crimes involved 50 grams or more of cocaine or cocaine base. The court made detailed findings substantiating 50 grams or more in the sentencing hearing by a preponderance of the evidence, but in light of *Apprendi*, this procedure was incorrect.

issued, the government urged affirmance of the sentences under the harmless or plain error standards, depending upon the stage at which appellants raised the issue. The government points out that several defendants were well aware of their exposure to life sentences, through the government's filing of an information requesting penalty enhancements because of their prior drug convictions. Moreover, Baptiste, Frank and Schexnayder were exposed to life sentences based on their recidivism if only five grams of cocaine base were involved in their transactions.[14] With respect to all of the defendants, the evidence showed that the crack distributed during the period of the conspiracy far exceeded the quantities necessary to justify their sentences. Government witnesses Womack and Thompkins provided evidence of the quantity of the drugs involved. Their testimony was apparently found credible by the jury, because the jury relied on their testimony to convict the appellants for using firearms during and in relation to drug trafficking crimes. Finally, because the appellants chose as their defense strategy to challenge the existence of any conspiracy they did not seriously contest the testimony concerning the quantity of drugs distributed.

As in *Miranda, Slaughter,* and *Green, supra,* the chances are virtually nil that the jury, confronted with this testimony about appellants' long-lasting conspiracy, would have found that the appellants distributed less than 50 grams of cocaine or cocaine base. Unlike those cases, there is no way to infer from the record that such a determination was reached by the jury. This court's other authorities compel remands for resentencing, albeit on various grounds.[15] Several circuits have, by contrast, applied the plain error standard in similar cases and affirmed enhanced sentences. *United States v. Promise,* 255 F.3d 150, 161 (4th Cir.2001) (en banc) (opinion of four judges); *United States v. Nealy,* 232 F.3d 825, 830 (11th Cir.2000); *United States v. Pease,* 240 F.3d 938, 943–44 (11th Cir.2001); *United States v. Mojica–Baez,* 229 F.3d 292, 310–12 (1st Cir. 2000).

One cannot help but note the unfortunate consequence here: conspirators who killed or maimed seven people without compunction, three of them in one family and two in another, in order to wipe out their rivals or intimidate witnesses, may be sentenced to a maximum of 20 or 30 years in prison. Yet, had it been forewarned of *Apprendi,* the government could have restructured its charges to emphasize the murders and attempted murders or add a statement on drug quantities.[16] As it

---

**14.** Baptiste had personally been arrested by the police twice and found to possess more than five grams on his person.

**15.** As noted at the outset of this section, Franklin's imprisonment sentence of 240 months is within the primary statutory limit for his offense and so raises no *Apprendi* issue. His enhanced sentence of supervised release, however, may run afoul of *Apprendi* according to the discussion in the last footnote in this section, and must be vacated.

**16.** The concurrence implies that this result, founded on an absence of drug quantity alleged in the indictment, is compelled by Supreme Court precedent regarding the Fifth and Sixth Amendments. *See, e.g., Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). With due respect, the Court's most recent pronouncement on the subject indicated that grand jury errors, like others in the trial process, may be tested by a harmlessness analysis. *U.S. v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50(1986). None of the Court's recent cases concerning the distinction between elements of a crime and sentencing factors considered the consequence of omission of an "element" from an indictment.

stands, a disproportionately lenient result is compelled by our current precedent.[17]

### F. Other sentencing issues.

Because resentencing is required, some of the appellants' other sentencing issues have become moot or should be reconsidered on remand. Schexnayder, for instance, argued that he should not have received a life sentence based on his multiple prior convictions. Jones and Parker expressly challenged, and Baptiste raised the issue by adoption, whether the district court should have sentenced them to consecutive sentences for multiple uses of firearms to advance a single drug conspiracy. These appellants raised this issue for the first time on appeal, citing *United States v. Tolliver,* 61 F.3d 1189, 1222 (5th Cir.1995) (holding that consecutive § 924(c)(1) sentences based on a single drug conspiracy were improper). Finally, several of the appellants contest the amount of drugs attributed to them during the course of the conspiracy. All of these issues may be reconsidered, if they remain viable, at sentencing.

### G. Remaining claims.

The appellants' remaining arguments do not merit discussion. Suffice to say that 1) the district judge's introduction of closing arguments was not plainly erroneous;[18] 2) there was no plainly erroneous variance between the final indictment and the proof at trial; 3) the district court did not plainly err by admitting into evidence six firearms that were seized during the investigation but were not directly connected to the offenses; 4) the district court did not commit plain error by allowing a police officer to testify about the way drug dealers commonly wrapped crack;[19] 5) there was no plain error from certain statements and lines of questioning by the prosecutors at trial; 6) there was no plain error from the admission of Frank's correspondence;[20] 7) the district court did not abuse its discretion by admitting evidence of Franklin's March 1997 arrest for possession of a pistol; and 8) the district court did not clearly err in finding that Baptiste was a "leader" of the conspiracy for sentencing purposes.

### III. CONCLUSION

We AFFIRM the appellants' convictions, but REVERSE their sentences and REMAND for resentencing.

---

**17.** The appellants also assert *Apprendi* challenges to their supervised release terms. Although § 841(b)(1)(C) facially does not limit the appellants' supervised release terms, 18 U.S.C. § 3583 does. *United States v. Meshack,* 225 F.3d 556, 578 (5th Cir.2000) (remanding supervised release sentences for *Apprendi* errors). Depending on their respective criminal histories, the appellants could not receive a supervised release term exceeding either three or five years. 18 U.S.C. § 3583(b)(1), (2); 18 U.S.C. § 3559(a); 21 U.S.C. § 841(b)(1)(C) (establishing a three year maximum for first-time felony drug offenders and a five year maximum for repeat offenders).

Here, Jones and Parker received five year terms and the other appellants received ten year terms. The district court must reconsider these supervised release terms appropriately.

**18.** Jones phrased his argument as a challenge to the introduction of the opening statements, but his brief indicates that he actually meant to challenge the introduction to the closing statements.

**19.** Although one attorney objected at trial to this testimony, he did not object on the ground that Franklin now asserts. Thus, we review this claim only for plain error.

**20.** The objection by one of the attorneys to the letters immediately before the jury instructions was not timely.

KING, Chief Judge, concurring in part and concurring in the judgment:

I concur in the judgment, together with Parts I, II.A–D, II.F–G, and III of Judge Jones's opinion (the "Opinion"). However, I respectfully disagree with the representation of our *Apprendi* jurisprudence set out in Part II.E of the Opinion.

I agree with the Opinion that our *Apprendi* precedent "compel[s]" this panel to vacate the defendants' sentences that exceeded the statutory maximum authorized for the offense stated in the indictment. However, the Opinion also asserts that our "approach to [*Apprendi*] cases has not been fully consistent" and classifies those cases into various purportedly conflicting groups. That characterization of our *Apprendi* jurisprudence is inaccurate.

*United States v. Meshack,* 225 F.3d 556 (5th Cir.2000), and the cases in the Opinion's "group two," i.e., *United States v. Miranda,* 248 F.3d 434 (5th Cir.2001), *United States v. Green,* 246 F.3d 433 (5th Cir.2001), and *United States v. Slaughter,* 238 F.3d 580 (5th Cir.2000), are not, as the Opinion claims, contradictory in their review of unpreserved *Apprendi* error. In all four cases, this court (1) recognized that under *Apprendi,* drug quantity was an element of the offense for which the defendant had been sentenced, and (2) applied plain error review because that sentencing issue was raised for the first time on appeal. *See Miranda,* 248 F.3d at 443, 445; *Green,* 246 F.3d at 436–37; *Slaughter,* 238 F.3d at 583–84; *Meshack,* 225 F.3d at 577–78. The different outcomes in those cases is attributable to the type of *Apprendi* error at issue. In *Meshack,* the element of drug quantity was omitted from the *indictment.* But in *Slaughter, Miranda,* and *Green,* the element of drug quantity, although stated in the indictment, was omitted from the *jury instruction.*

Unlike *Meshack,* the indictments in *Slaughter, Miranda,* and *Green* charged all the elements of the offense for which the defendants were convicted and sentenced. This court's analyses in *Slaughter, Miranda,* and *Green* are straightforward applications of *Apprendi,* consistent with controlling precedent on omission of an element from the *jury instruction.* In such a situation, even when the error is plain, we conduct harmless error review. *See Neder v. United States,* 527 U.S. 1, 10, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that jury instructions that erroneously omit an element of the offense are subject to harmless error analysis). Under *Neder,* the error is harmful only if "the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *Id.* at 19, 119 S.Ct. 1827. Applying harmless error review, we found in *Slaughter, Miranda,* and *Green* that based on the evidence, a jury could not rationally have found that the defendant was not responsible for the drug quantity stated in the indictment. *Miranda,* 248 F.3d at 446;[1] *Green,* 246 F.3d at 436–37; *Slaughter,* 238 F.3d at 583–84. Thus, a sentence revision was not required in those cases.

Similarly, this court's analysis in *Meshack* is a straightforward application of *Apprendi,* but, of course, is consistent with controlling precedent on omission of an element from the *indictment.* Because the indictment in *Meshack* did not include

---

1. While we did not explicitly cite to *Neder* in *Miranda,* we conducted a harmless error inquiry within the plain error framework as required by *Neder. See Miranda,* 248 F.3d at 446 (stating that it was "highly unlikely that a jury ... would find drug quantities attributable to each defendant to be different from the amounts attributed to each defendant in the PSRs").

the quantity of crack cocaine, the indictment charged a crime that carried a statutory maximum of 30 years. However, the sentence imposed on one of the defendants exceeded 30 years. Therefore, the defendant was entitled to be resentenced in accordance with the crime for which he had been charged and convicted. *See Meshack,* 225 F.3d at 576–78; *see also, e.g., United States v. Cabrera–Teran,* 168 F.3d 141, 143 (5th Cir.1999) ("To be sufficient, an indictment must allege each material element of the offense; if it does not, it fails to charge that offense."); *United States v. Fitzgerald,* 89 F.3d 218, 221 (5th Cir.1996) ("[I]f raised for the first time on appeal and the appellant does not assert prejudice, that is, if he had notice of the crime of which he stood accused, the indictment is sufficient unless it is so defective that by any reasonable construction, *it fails to charge the offense for which the defendant is convicted.*") (emphasis added); *United States. v. Outler,* 659 F.2d 1306, 1311 (5th Cir. Unit B Oct.1981) ("Unless every element of an offense appears in the indictment, it is *impossible* to assure the defendant that a grand jury properly determined probable cause of the offense.") (emphasis added). *Meshack* does not conflict with *Slaughter, Miranda,* and *Green;* the latter cases simply arose in a fundamentally different context.

The cases constituting the Opinion's so-called "third group" are similar to *Meshack* because the error was in the indictment's omission of a fact that was an element under *Apprendi* (i.e., drug quantity that was used to enhance the sentence beyond the statutory maximum). Applying *Apprendi,* those cases held, like *Meshack,* that the sentences exceeded the statutory maximum of the crime charged in the indictment, and resentencing was required under the plain error standard. *See United States v. Gonzalez,* 259 F.3d 355, 359–61 (5th Cir.2001), *vacated and reh'g en banc granted* (5th Cir. Aug. 15, 2001); *United States v. Longoria,* 259 F.3d 363, 365 (5th Cir.2001), *vacated and reh'g en banc granted* (5th Cir. Aug. 15, 2001); *United States v. Vasquez–Zamora,* 253 F.3d 211, 214 (5th Cir.2001); *United States v. Garcia,* 242 F.3d 593, 599 n. 5 (5th Cir.2001).[2]

The Opinion also errs in singling out *Gonzalez* as a particularly problematic instance of inconsistency in our *Apprendi* precedent. First, *Gonzalez* is inapposite to cases such as *Slaughter, Miranda,* and *Green* because they did not concern defective indictments. Second, *Gonzalez* is also distinguishable from *Garcia* because *Garcia* involved de novo review. *See supra* note 2 (explaining that the *Garcia* defendant had preserved his *Apprendi* challenges by raising them below). Third, *Gonzalez,* like *Meshack* and *Vasquez–Zamora,* applied plain error review. *See Gonzalez,* 259 F.3d 355, 359. Finally, the outcome in *Gonzalez* is nothing new. Rather, the *Gonzalez* court, like the *Vasquez–Zamora* court, exercised its discretion under the fourth prong of plain error

---

2. The Opinion appears to fault these cases for raising the *Apprendi* issue *sua sponte.* I am not generally an advocate for *sua sponte* review. But, in fairness to the panels that decided these cases, they did not feature the "classic" *sua sponte* situation—i.e., the court did not notice the *Apprendi* issue entirely of its own initiative. In *Gonzalez* and its companion case, *Longoria,* the government raised the *Apprendi* issue. *See Gonzalez,* 259 F.3d 355, 359. In *Vasquez–Zamora,* while the defendants had not raised *Apprendi* challenges as to their prison sentences, they had done so with regard to their supervised release terms. *See Vasquez–Zamora,* 253 F.3d at 214 & n. 4.

In *Garcia,* the defendant had also challenged his supervised release term on appeal, but not his prison sentence. *See id.* at 599 & n. 5. However, because the defendant had challenged his prison sentence on *Apprendi* grounds below, the court conducted de novo review. *See id.* at 599.

review to correct the error because the offense actually stated in the indictment (without a drug quantity) carried a statutory maximum less than the sentence that was imposed.

*Gonzalez* explained that because of the jurisdictional "nature" of the error (which is discussed below), evidence of the drug quantity at trial or the defendant's acknowledgment of the quantity was irrelevant and could not cure the grand jury's lack of notice of the quantity element (which was an element only because it was used to enhance the sentence). *See id.* at 360 n. 3. The *Gonzalez* court also pointed out that the fact that the grand jury did not pass upon the quantity factor did not mean that the conviction failed to charge any offense, but merely that it did not charge the aggravated offense. That is, the quantity omission from the indictment did not render the conviction deficient, but rather resulted in a sentencing error. *See id.* Thus, the court had jurisdiction, i.e., the authority, to sentence the defendant only under the offense as stated in the indictment, and not under an offense that required the additional element of drug quantity.

By noting that "*Gonzalez* may have properly interpreted this court's attachment to precision in indictments," *see supra* Opinion at note 11, the Opinion acknowledges that the omission of an element from the indictment "may" trigger a different legal analysis than that triggered by the omission of an element from the jury instruction. The Opinion attempts to diminish the significance of that consideration, however, by stating that "*Apprendi* expressly declined to deal with the constitutional implication of sufficiency of the indictment." *See supra* Opinion at note 11. To be clear, the *Apprendi* Court did not address the indictment issue because the Present-

ment Clause of the Fifth Amendment has not been made applicable to the states via the Fourteenth Amendment. *See Apprendi* at 477 n. 3, 120 S.Ct. 2348. The Opinion's suggestion that *Apprendi* may be limited to the rights to a trial by jury and to a beyond-a-reasonable-doubt standard of proof is based on a fundamental misunderstanding of *Apprendi.*

*Apprendi* is the Court's latest addition to a subset of cases in the Court's Fifth and Sixth Amendment jurisprudence drawing a constitutional line between "sentencing factors" and "elements." *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the statutory maximum penalty beyond the prescribed statutory maximum" is an element. It follows (1) that defendants such as Apprendi, who are subject to a state prosecution, are entitled to have such facts submitted to a jury and proved beyond a reasonable doubt, and (2) that defendants such as those in this case, who are subject to federal prosecution, are entitled to those same rights *and* to the right to be tried and sentenced only upon an indictment by a grand jury.

Indeed, in the *Apprendi* opinion itself, the Court contrasted the state prosecution before it with the federal prosecution challenged in *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). *See Apprendi,* 530 U.S. at 477 n. 3, 120 S.Ct. 2348. In *Almendarez–Torres,* the Supreme Court stated that *if* 18 U.S.C. § 1326(b)(2) "consti- . tute[d] a separate crime, then the Government must write an indictment that mentions the additional element." *See* 523 U.S. at 226, 118 S.Ct. 1219. More importantly, the *Apprendi* Court explicitly adopted as its holding "the opinion that we expressed in [*Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311

(1999) ]." *Id.* at 490, 120 S.Ct. 2348. In *Jones,* a case involving a federal prosecution, the Court stated that the Fifth and Sixth Amendments require that "any fact (other than prior conviction) that increases the maximum penalty for a crime *must be charged in an indictment,* submitted to a jury, and proven beyond a reasonable doubt." 526 U.S. at 243 n. 6, 119 S.Ct. 1215 (emphasis added).[3]

Thus, the Opinion cannot reconcile the purported conflict that the Opinion attributes to the difference between our *"Apprendi* indictment" cases and our *"Apprendi* jury instruction" cases by concluding that it may be unnecessary to include in the indictment those facts that *Apprendi* deems to be elements—i.e., facts that trigger a sentence that exceeds the statutory maximum prescribed in the absence of that fact. The other means of "reconciliation" that the Opinion appears to suggest is also unworkable. In assessing the *Apprendi* challenges, the Opinion states that authorities "other" than *Slaughter, Miranda,* and *Green* compel us to vacate the defendants' sentences in this case. However, the Opinion posits, applying the *Neder*/rational jury standard invoked in *Slaughter, Miranda,* and *Green* to this case would lead to the conclusion that "the chances are virtually nil that the jury ... would have found that the appellants distributed less than [the quantities necessary to justify their sentences]."

As explained above, *Miranda, Slaughter,* and *Green* are inapposite to the instant case because they dealt with defective jury instructions, not defective indictments. Thus, the harmless error (rational jury) inquiry utilized in those cases is inapplicable here. Our precedent clearly dictates that Appellants (except Franklin) are to be resentenced for the crime for which they were charged. That result is also required by Supreme Court precedent, which makes clear that the rational-jury inquiry is irrelevant where an element is omitted from the indictment, because the *petit* jury has no authority to determine elements that were not presented to the *grand* jury. *See, e.g., Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him."); *Stirone v. United States,* 361 U.S. 212, 215–16, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) (stating that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself"); *Ex parte Bain,* 121 U.S. 1, 12–13, 7 S.Ct. 781, 30 L.Ed. 849 (1887) (stating that "an indictment found by a grand jury [is] indispensable to the power of the court to try the [defendant]"); *see also United States v. Promise,* 255 F.3d 150, 168 (4th Cir.2001) (en banc)(Niemeyer, J., concurring in the judgment) (listing cases and stating that "it is utterly meaningless to posit that any rational grand jury *could* or *would* have indicted the defendant because it is plain that this grand jury *did not,* and, absent waiver, a constitutional verdict cannot be had on an unindicted offense" (internal quotations, alterations, and citation omitted)); *id.* at 186–95 (Motz, J., concurring in part and dissenting in part, and dissenting in the judgment).

**3.** *See also Apprendi,* 530 U.S. at 510–11, 120 S.Ct. 2348 (Thomas, J., concurring) (emphasizing that indictments must contain all elements of the offense).

The Opinion suggests that we may disregard the longstanding Supreme Court precedent on indictments because "the Court's most recent pronouncement on the subject indicated that grand jury errors, like others in the trial process, may be subject to a harmless error analysis." *Supra* Opinion at note 15 (citing *United States v. Mechanik*, 475 U.S. 66, 70, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986)). But the *Mechanik* Court addressed an error in the proceedings before the grand jury—not a deficiency in the indictment. 475 U.S. at 67, 106 S.Ct. 938 (assuming "that the simultaneous presence and testimony of the two Government witnesses before the grand jury violated [Federal Rule of Criminal Procedure] 6(d)"). The Court did, however, address such a deficiency in a decision issued just one year before *Mechanik*.

In *United States v. Miller*, the Court addressed the question "whether the Fifth Amendment's grand jury guarantee is violated when a defendant is tried under an indictment that alleges a certain fraudulent scheme but is convicted based on trial proof that supports only a significantly narrower and more limited, though included, fraudulent scheme." 471 U.S. 130, 131, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). In contrast to *Mechanik*, the *Miller* Court did not consider what the petit jury did or might have done if the alleged error had not occurred. Rather, the Court focused on the indictment itself, and whether the variance had deprived the defendant of his right to be convicted and sentenced only on charges presented to a grand jury. *See id.* at 135–45, 105 S.Ct. 1811. Importantly, in concluding that the indictment did not violate the defendant's Fifth Amendment right to a grand jury, the Court stated: "The variance complained of *added nothing new to the grand jury's indictment* and constituted no broadening." *Id.* at 145, 105 S.Ct. 1811 (emphasis added). In

this case, the drug quantity on which the defendants' sentences were based *did* add something new—i.e., an element. Consequently, the defendants (other than Franklin) were sentenced for a greater crime than the one with which they had been charged and of which they had been convicted. Thus, under the relevant Supreme Court precedent, those defendants' sentences must be vacated.

The Opinion also asserts that the First, Fourth, and Eleventh Circuits have, under plain error review, affirmed enhanced sentences in cases in which the quantity was not stated in the indictment. *See United States v. Promise*, 255 F.3d 150 (4th Cir. 2001) (en banc); *United States v. Pease*, 240 F.3d 938 (11th Cir.2001); *United States v. Nealy*, 232 F.3d 825 (11th Cir. 2000); *United States v. Mojica–Baez*, 229 F.3d 292 (1st Cir.2000). As the Opinion recognizes, in *Promise*, the en banc Fourth Circuit did *not* obtain a majority for the proposition that under plain error review a court may choose not to correct a sentence that is enhanced beyond the maximum for the offense stated in the indictment. A majority of the court agreed that *Apprendi* applied to the drug trafficking offenses stated in § 841 and that an *Apprendi* error occurred in the case. A different majority affirmed the conviction and sentence. That majority consisted partly of those who believed that the *Apprendi* error did not pass muster under the fourth prong of plain error review and partly of those who believed that no *Apprendi* error had occurred in the case.

Two judges who voted to affirm the sentence explicitly stated that if they were to proceed from the premise that an *Apprendi* error had occurred, then they would be bound by Supreme Court and appellate precedent to conclude that they must correct the sentencing error. *See Promise*, 255 F.3d at 168 (Niemeyer, J., concurring in the judgment) (stating that

"[i]f quantity were an element of an aggravated offense, such an offense was not charged, and any sentence could not have been based on that offense"). Six judges stated that under the plain error standard, not only did a plain error affecting substantial rights occur, but also that the error must not be allowed to stand. *See generally id.* at 186–95 (Motz, J., concurring in part and dissenting in part, and dissenting in the judgment); *see also id.* at 187 (stating that the "imposition of [a sentence for a crime for which the defendant was never charged or convicted] is antithetical to our system of justice" and that it "[deprived the defendant] of the most fundamental of rights—the right to be tried and convicted *only* on charges presented in an indictment returned by a grand jury").

The Eleventh Circuit, in *Pease*, and the First Circuit, in *Mojica–Baez*, did apply plain error analysis to the omission of an element from the indictment and affirm sentences exceeding the statutory maximum prescribed for the offense charged in the indictment. *Pease*, 240 F.3d at 944; *Mojica–Baez*, 229 F.3d at 311–12. Applying plain error review, the *Pease* court concluded that the omission of drug quantity from the indictment did not affect the defendant's "substantial rights" because he admitted to the necessary quantity of cocaine in his plea.[4] In *Mojica–Baez*, the court extended *Neder* to cases where an element is missing from the indictment. *See Mojica–Baez*, 229 F.3d at 306–12.

However, the Opinion neglects to mention the cases that are contrary to *Pease* and *Mojica–Baez*. For instance, in *United States v. Tran*, the Second Circuit explicitly rejected *Mojica–Baez* and stated that

generally "the indictment as returned limits the scope of the district court's jurisdiction to the offense charged in the indictment." *See* 234 F.3d 798, 809 (2d Cir. 2000). While *Tran* went even further than we did in *Gonzalez* and stated that plain error review is inappropriate when an indictment is missing an essential element, *see id.* at 806, it recognized (as did a majority of the Fourth Circuit judges in *Promise* ) that *Neder*, a jury instruction case, cannot be transplanted to the indictment context, *see id.* at 809 n. 2.

This brief analysis of our sister circuits' cases demonstrates that *Gonzalez* is by no means alone in its approach. Most of these cases are either in line with *Gonzalez* or inapposite to *Gonzalez*. Moreover, *Gonzalez* is faithful to longstanding Supreme Court precedent regarding the grand jury and the indictment.

The Opinion's claim that our *Apprendi* cases are inconsistent is based entirely on the proposition that those cases apply the same standard of review and produce different outcomes. That, of course, is often the case when the error reviewed in one set of cases (omission of an element from the indictment) is not the same as the error reviewed in the other set of cases (omission of an element from the jury instruction). Comparing apples with oranges, the Opinion unfairly maligns this circuit's *Apprendi* jurisprudence. Our precedent as a whole dictates that we vacate the § 841 sentences of all Appellants, except Franklin's § 841 prison sentence, and remand for resentencing.

---

4. In *Nealy,* the other Eleventh Circuit case cited by the Opinion, the court explicitly declined to decide the indictment issue as it related to *Apprendi* because it was not properly raised. *See* 232 F.3d at 830–31. As did

this court in *Slaughter, Miranda,* and *Green,* the *Nealy* court addressed the erroneous jury instructions under the familiar *Neder* standard. *See id.* at 829–30.