UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Lloyd DAVIS, a/k/a Dr. Dudley
Dee Goulden, III,
Defendant-Appellant.

No. 74–3929.

United States Court of Appeals,
Fifth Circuit.

Nov. 24, 1975.

Wendell R. Morgan, Montgomery, Ala. (Court appointed), for defendant-appellant.

Ira DeMent, U. S. Atty., D. Broward Segrest, Asst. U. S. Atty., Montgomery, Ala., for plaintiff-appellee.

Before GODBOLD, SIMPSON and CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

Following our reversal of his conviction at his first trial,[1] the appellant was retried before a jury and again found guilty of four counts charging: (1) conspiracy (Title 18, U.S.C. § 371) to commit mail fraud (Title 18, U.S.C. § 1341) and Dyer Act violations (Title 18, U.S.C. § 2312), (2) substantive violation of the

1. *United States v. Davis, a/k/a Dr. Dudley Dee Goulden, III*, 5 Cir. 1974, 496 F.2d 1026. In that trial as in the present one the central issue was raised by the defendant's defense of not guilty by reason of insanity. We held that prejudicial error occurred when the trial judge called to the jury's attention his pre-trial adjudication of the defendant's competency to stand trial, in violation of the provisions of Title 18, U.S.C. § 4244.

mail fraud statute (Title 18, U.S.C. § 1341, (3) and (4) substantive violations of the Dyer Act (Title 18, U.S.C. § 2312).

Prior to the retrial, the district court again held a competency trial and found Davis competent to stand trial. Davis went to trial on a plea of not guilty by reason of insanity. The government's evidence as to the actual commission by Davis of the offenses charged was overwhelming and not seriously contested. Such evidence closely paralleled that introduced at the first trial and summarized in our earlier opinion. 496 F.2d at 1028.

We discuss hereinafter the two principal points relied upon by appellant for reversal, but finding no substance therein, we affirm.

Davis had been treated at State Security Hospital, Larned, Kansas, in 1969. Dr. George Getz, Superintendent of this hospital testified at trial as a defense witness. Dr. Getz himself had never examined Davis. After qualification as an expert in psychiatry, he identified the defendant's hospital records from Larned, and testified therefrom at length. Dr. Getz testified that the records showed an admission diagnostic impression, recorded by a competent staff psychiatrist, Dr. Smith, in January 1969, that Davis was suffering at the time from a schizophrenic, paranoid type reaction. He identified a series of later record entries by Dr. Smith reflecting diagnoses of anti-social personality and latent schizophrenia, and a final diagnosis of anti-social personality and schizophrenia in remission. The witness defined schizophrenia and "in remission". He also testified that Davis, in February 1970 received an established diagnosis of anti-social personality, which would not necessarily invalidate prior diagnoses. His direct examination ended with his statement that from the records before him the defendant was suffering from a mental disease or mental illness from April 1969 to October, November 1969.

The prosecutor began cross-examination of Dr. Getz by establishing that Dr. Smith was only six months out of residency training in 1969 when he examined Davis. This dialogue followed:

Q. All right, sir. Based on your examination of the files, do you—did you come to a conclusion as to how Dr. Smith reached his opinion or reached his diagnoses?

MR. ALTON: We object.

MR. MORGAN:[2] We object, your honor.

THE COURT: Overruled.

A. Yes.

Q. What is this opinion?

A. The opinion is that at the time Dr. Smith made his initial examination, he deferred the diagnosis, of course, pending further data. In the meantime, he received reports by telephone, later confirmed in writing, from the Wichita officials who had been involved in admission. And he took into account information which they had presented having to do with their conclusions from their studies and then incorporated that, as I would see it, into the report. Going along with that, he had an interview with the patient, and he recorded a couple of things in particular. One, at that time, he believed that the patient had gone through the second year of medical school at McGill University. Dr. Smith was Canadian; he thought highly of the University. He felt that, indeed, this indicated that at one time, there had been a capacity for a very complex and productive life style. He, therefore, read backwards from that that there had been a great deal of deterioration. Therefore, he tended to draw a conclusion in which he incorporated comments about the amount of deterioration that had taken place.

2. Messrs. Alton and Morgan were defense counsel.

■ The trial judge's allowance of this question and answer is appellant's first ground of asserted error.[3]

The brunt of the claimed error is that Dr. Getz was not asked for his expert opinion; he was asked rather to state *his opinion of Dr. Smith's* reasons for Smith's diagnosis.

We consider it important to note that the government objected without avail to Dr. Getz testifying on direct from the Larned hospital records concerning opinions as to insanity rendered by other doctors reflected therein. The record on appeal fails to indicate any effort by the defense to subpoena any of the doctors whose opinions were lodged in the hospital records or otherwise to procure their attendance at trial, or to take their deposition under Rule 15, F.R.Crim.P.

The following occurred early in the direct examination of Dr. Getz:

Q. Do you have a report from a Dr. Adams in the file?

A. Yes, sir.

Q. Who is Dr. Adams?

MR. DeMENT: [United States Attorney] Your honor, we object to any report from another M.D. who they could have available.

THE COURT: Well, these records are all a part of the records; I will let it in evidence. (Tr. 572–573)

\* \* \* \* \* \*

Q. Would you tell us what his impressions were?

A. He says, 'it is my impression that at this time he is suffering from a schizophrenic, paranoid type reaction of such a degree that precludes his preparation of his own

defense. It is recommended that this patient'—(Tr. 573)

Defense counsel was then permitted, over further government objection, to ask Dr. Getz as to Dr. Smith's identity, his professional capability, and to question him as to Dr. Smith's diagnosis of the defendant's mental condition as reflected in the hospital records. (Tr. 573–578). Dr. Getz was then examined by the defense as to Dr. Mary Slechta, another Larned staff psychiatrist who had made entries in Davis' hospital record, her competency, and her diagnostic impressions as reflected by the hospital record. Dr. Slechta had not been subpoenaed nor had her·deposition been taken. Like Dr. Smith, she was unavailable for cross-examination at trial by the prosecution as to her opinions and the basis for them.

The United States did not object to the admission of these hospital records, as such.[4] It did object without avail when the defense went into the subject of the opinions of Drs. Smith and Slechta. We hold that the trial court's allowing the cross-examination of Dr. Getz as to the basis for Dr. Smith's opinion was a permissible exercise of that court's discretion as to the proper scope of legitimate cross-examination about a subject opened up by the defense in the direct examination of Dr. Getz. See, generally Wharton's Criminal Evidence (13th Ed. 1972, Torcia) Vol. I, § 162, p. 295–96.

This conclusion is reinforced by consideration of the jurisprudence of this circuit, which is strongly to the effect that where a defense of insanity is raised, the trial court should be liberal in its rulings on the admissibility of evidence bearing on that issue. See, e. g., *Blake v. United*

---

3. Dr. Getz testified later that from his careful review of the record he had concluded that Davis had never suffered from schizophrenia.

4. We do not find in the trial record an actual offer and receipt in evidence of the Larned hospital records. It is quite clear that they were present and that Dr. Getz testified extensively on direct examination as to their contents and in explanation of the terms used and the like. See text, *supra*. In at least one place

in the record the trial judge ruled in a way to indicate his belief that the hospital records had been received. See the portion of Dr. Getz's direct examination (Tr. 572–73) quoted on page 1267 text, *supra*, where the trial court stated: "The Court: Well, these records are all a part of the records. I will let it in evidence." We treat the hospital records as though formally offered and received in evidence.

*States*, 5 Cir. 1969, 407 F.2d 908, 911; *Mims v. United States*, 5 Cir. 1967, 375 F.2d 135. See also, *Pope v. United States*, 8 Cir. 1967, 372 F.2d 710, 736. In *Blake*, we stated:

"We come then to the sufficiency of evidence question. The district court followed the salutary principle, applicable in cases involving the defense of insanity, of admitting all evidence, both lay and expert, in any wise relevant or pertinent, to the issue of insanity. This is in keeping with the philosophy of letting in all facts which might be helpful to the jury in making the final determination of the criminal responsibility of the accused. See *Mims v. United States*, supra, 375 F.2d at p. 143, where the court pointed to the sound rule that the issue of insanity should be determined by the jury from all of the evidence rather than from the opinion of experts alone." 407 F.2d at 911.

Prejudicial error is not demonstrated with respect to this issue.

■ The second trial incident giving rise to claimed error on this appeal also had its genesis during the cross-examination of Dr. Getz, though the objection is specifically directed to claimed improper argument by the prosecutor during summation to the jury.

Both explicit and implied reference to the defendant's prior criminal record—or at least his brushes with the law—occurred during the cross-examination of Dr. Getz, in each instance without objection:

(a) When this question was asked, "All right, sir. In . . . September, 1969, he was discharged and returned to Court in Kansas, was he not?" and the witness replied "Yes, sir."

(b) When, after the prosecutor developed that Davis had made a request of Dr. Smith regarding the diagnosis of schizophrenia paranoid type, this dialogue followed:

"Q. Would you tell us what this was?

A. This is a note that is from the admission meeting, December 17, 1969, and there are some preliminary observations about the patient essentially describing that he seems to be functioning well. It says that he made many demands during the interview, asked that Dr. Smith change his diagnosis, stating that he believes that he is not a schizophrenic and that this diagnosis is a social problem for him, because when he leaves the hospital, it is possible that he will be released from jail." (Page 586)

(c) When Dr. Getz testified as to a note by Dr. Junco:

"Q. All right, sir; did Charles Lloyd Davis give Dr. Junco any information that time—at that time and make a request?

A. It says 'The patient states that he wrote to Dr. Getz because he did not see why he should stay in the Security State Hospital since he does not have any sentence. He also states that he is not paranoid and wants to be transferred to an open ward because the Court dropped his charges . . . .'" (Pages 586–587)

Thereafter the prosecutor asked Dr. Getz the following question, to which objection was made and sustained:

"Q. All right, sir. Now, one day after he gets back from Court, he's asking the psychiatrist to change his diagnosis that he is a schizophrenia, paranoid-type. Do the Court records reflect that certain charges—that—that he was found not guilty by reason of insanity?"

Later in the cross-examination of Dr. Getz he was questioned as to his ability to learn from the records seen by him whether or not Charles Lloyd Davis ever attended McGill Medical School. The answer and ensuing examination are set out below:

"A. We have two letters from the Registrar of McGill saying that there is no record of any such person in any such program.

Q. All right; so his claim that he went to McGill Medical School was a false claim?

A. As far as I know, inasmuch as on the rap sheet there are other places listed where he was during the dates he was—

MR. MORGAN (defense counsel): We object.

THE COURT: I sustain the objection to this line of questioning.

MR. SEGREST (Assistant U. S. Attorney): Sir.

THE COURT: Sustain objection to this line of questioning. I will let him testify as to the medical diagnoses and the hospital records based upon his mental condition, but some letter from McGill University and all that, where he was, objection is well taken; I sustain it.

Q. (by Mr. Segrest to the Court) Isn't it necessary in order to form some of these medical opinions to—to check on—to see if you can verify what the patient is saying?

THE COURT: All right; the objection and the Court's ruling cover that."

While Dr. Getz gave this testimony on cross-examination, he had earlier during his direct examination, referred to Davis' mental problems in a way that could be construed only as indicating that Davis had been sent to the state hospital and other institutions as a result of involvement in criminal offenses.

Defense counsel, referring to the date of Davis' admission to Larned State Security Hospital, asked Dr. Getz: "All right. Was any diagnosis made at that time?" The dialogue continued (Tr. 572–573):

"A. The patient was diagnosed—in fact, he was not diagnosed at the time the admission note was written. This was January 29 when Dr. Smith dictated the note. The patient had been referred from Wichita; at the end,

it says, 'Diagnosis at the this point is deferred, and at the present the question in the examiner's mind is what severe enough pathology *led Dr. Adams of Wichita to deem this man unable to stand trial.*' So that was the admission conclusion. (Tr. 572) [Emphasis supplied.]

Q. Do you have a report from a Dr. Adams in the file?

A. Yes, sir.

Q. Who is Dr. Adams?

MR. DeMENT: Your honor, we object to any report from another M.D. who they could have available.

THE COURT: Well, these records are all a part of the records; I will let it in evidence.

Q. Who is Dr. Adams, please, Doctor?

A. I have never met Dr. Adams. I don't know whether he is still in Wichita. The correspondence and the reports would indicate that at the time, he was practicing psychiatry in Wichita.

Q. All right. Would you—would you tell us what the record discloses of Dr. Adams' impressions in this case?

A. Dr. Adams has three parts in his report. He has the verbatim interview recorded. He has a brief report of psychological testings by a Dr. Vogt. And he incorporates this information, then, *into a letter back to the Honorable William C. Kandt, who was the Judge of the District Court, Division One.* [Emphasis supplied.]

Q. Yes, sir.

A. Okay.

Q. Would you tell us what his impressions were?

A. He says, 'It is my impression that at this time he is suffering from a schizophrenic, paranoid type reaction of such a degree *that precludes his preparation of his own*

*defense.* It is recommended that this patient'—[Emphasis supplied.]

Q. Thank you, thank you. Doctor, who is Dr. Smith?"

(Tr. 572–573)

Davis did not testify in his own behalf and our attention is directed to no further references in the trial testimony to any prior criminal entanglements on his part.

In his closing argument the attorney for the government asserted:

" . . . from the records, there was an indication that Charles Lloyd Davis faked off Dr. Smith in order to beat the rap in Kansas. What happened the day after he got back after beating the rap on the Kansas cases, after he had been arrested and charged with the crimes and he beat the rap by faking insanity?"

and later argued:

" 'We pick him up again after 1969 when he fakes his way out of the charges in Kansas, we pick him up in '71 again under psychiatric care.' Well, in '71, when do we pick him up again? After he has been arrested for committing more crimes."

Neither argument was objected to when made, but at the conclusion of all arguments defense counsel out of the jury's presence moved the court for a mistrial on the ground that the prosecuting attorney had made improper comments on Davis' past criminal record which were not substantiated by the evidence. The court denied this motion.

The argument of the Assistant United States Attorney did not take the form—despite defense counsel's vigorous contention, orally and on brief—of calling attention to Davis' criminal record, whatever it may have been. It was directed rather, to the central issue of sanity *vel non* at the time of the commission of the offense charged, and the light to be shed on that problem by a study of Davis' prior hospitalizations and the reasons therefor. While we question the propriety and good taste of use by a

prosecutor of such expressions as "faked off Dr. Smith in order to beat the rap in Kansas", "he beat the rap by faking insanity", and "when he fakes his way out of the charges in Kansas", we are not prepared to say that such language commented unfairly—albeit in common street language—on the contents of the hospital records and other matters before the jury.

The prosecuting attorney's purpose, we think, was to urge the jury to conclude, upon the contents of the record, that Davis was a malingerer, that his onsets of mental problems in the past were preceded by brushes with the law, and that his trial defense of insanity was a further manifestation of that pattern.

We note, moreover, defense counsel's closing jury argument, to which government counsel's argument was largely a response.

"You will recall the defendant was in a mental hospital in Larned, Kansas, in the year 1969. I believe it started some place in April. You probably recall that testimony better than I do. You rely on your recollection of the testimony; but as I recall it, he was there sometime in April. Dr. Smith—there is testimony Dr. Smith was a competent psychiatrist at that institution. Dr. Smith entered a series of diagnoses on this individual, and he labeled him paranoid schizophrenic, among other things, anti-social personality. This diagnosis continued for a period of time. He was discharged. We later pick him up sometime in 1971. Where? Again under psychiatric care. We pick him up in 1972. He's examined by a Dr. Hamby. Dr. Hamby gets some pretty bizarre test results. Dr. Hamby feels—and you heard his testimony—that the man had suffered a serious mental defect at some time in his past. Even though Dr. Hamby felt he—the defendant was trying to manipulate the test results, he did say, and you'll recall, that he felt this defendant had suffered a mental illness in his past. He used the term, 'burned out schizophrenic.' We

see Mr. Davis under psychiatric care at Springfield. In Atlanta. We see him on medication in both places. There is testimony to the effect that he was in med—on medication. We see him at Marion. You heard the testimony of Dr. Bowles. Dr. Wilson. And Dr. Bright. Dr. Bright felt like, based on his admittedly limited period of observation, but that is all he had to go on, Dr. Bright felt like he was schizophrenic; I think he used the term, 'undifferentiated chronic schizophrenic.' Dr. Wilson again used the word, 'schizophrenic,' in arriving at his diagnosis. It's clear to me from reviewing this testimony that came to you from the witness stand that there is a reasonable doubt about whether this man was or wasn't sane at the time this was— offense was committed. The opinions of the Government's witnesses to the contrary are based on information that they considered primarily arrived at subsequent to the offense. The Larned Hospital records, 1969, is prior to this. Now, use that information that came to you from the witness stand in making up your mind about whether or not, at the time of the offense, this man was sane or insane."

The clear import to be drawn from this argument was that Davis was at Larned State Security Hospital in 1969, and later at the United States Penitentiary in Atlanta, Georgia; that he was at the United States Medical Center for Federal Prisoners in Springfield, Missouri, and the United States Penitentiary at Marion, Illinois, in 1971 and 1972, and that he was at those times suffering from and being treated for a mental defect or disease. The government had a right to reply.

The response of the United States was that Davis spent time in mental institutions and the psychiatric wards of the prisons named as the result of being arrested and charged with crime. We are not prepared to hold that the response

was unjustified. Equally, we do not view it as an invasion of Fifth Amendment rights.

An additional consideration is that the position on appeal is substantially weakened by the failure to object to the argument when made, so that the trial judge could have instructed the jury to disregard the argument, or the prosecution could have withdrawn or explained it. See *United States v. Elmore*, 4 Cir. 1970, 423 F.2d 775, 781; *Fogarty v. United States*, 5 Cir. 1959, 263 F.2d 201, 204.

The judgment appealed from is

Affirmed.