**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Clifford McRARY, Defendant-Appellant.**

No. 79–5023.

United States Court of Appeals,
Fifth Circuit.

April 30, 1980.

Thomas M. Sherouse, Asst. U. S. Atty., Miami, Fla., for defendant-appellant.

Sonia Escobio O'Donnell, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before TUTTLE, FAY, and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

This is an appeal from a jury verdict finding the defendant guilty of kidnapping (18 U.S.C. § 1201(a)). The defense was insanity at the time of the act. We reverse because of the exclusion of testimony of defendant's wife, and of testimony of the psychologist and psychiatrist called by the defendant, which testimony would have permitted the defendant to offer proof of folie à deux as an element of his defense of insanity.

Believing that a recurrence would be unlikely, we need not discuss the claimed errors related to a juror's misconduct in discussing the jury deliberations with a newsman, the giving of the *Allen* charge, and certain elements of the charge relating to the offense. We will discuss the alleged errors of wrongful venue and whether the defendant's incarceration in Cuba constituted a conviction that would make this trial second jeopardy.

On July 22, 1974, the defendant, Clifford McRary, and his wife, Patricia, commandeered a fishing vessel they had rented in Key West, Florida, and forced the Captain and mate to transport them to Havana, Cuba. Their children, ages 12 and 9, accompanied them. The McRarys had told the Captain they wanted to go to Dry Tortugas. Approximately eleven miles from shore, Mr. McRary pointed a pistol at the Captain, Mrs. McRary stood guard on the lower deck with a rifle, and the Captain was directed to take them to Cuba. Wisely, he assented. They arrived in Havana at approximately 7:15 p. m. The Captain and mate returned to Key West three days later on the boat. They sustained no physical harm but were mentally stressed and tormented by their experience.

The McRarys returned to Miami and were arrested on August 8, 1978. While in Cuba Mr. McRary served seven months of a three-year sentence. The record does not contain a description of the crime with which McRary was charged in Cuba. A communication from the U. S. State Department merely states "The Cuban authorities have decided to turn the perpetrators of the above-mentioned acts over to the competent courts, to be tried in accordance with Cuban law for the most severely pe-

nalized offense in accordance with the circumstances and gravity of such acts."

Prior to trial of this case both Mr. and Mrs. McRary were examined by Dr. Syril Marquit, a psychologist, and Dr. Arthur Stillman, a psychiatrist, to determine their competency to stand trial and to determine their sanity at the time of the commandeering of the boat for the trip to Cuba. Mr. McRary did not assert that he was incompetent to stand trial but did plead insanity at the time of the trip to Cuba. At the beginning of Mr. McRary's trial, reference is made by the court that Mrs. McRary had been found incompetent to stand trial.

The defense tendered Mrs. McRary as a witness to show her husband's state of mind during the days and weeks immediately prior to the trip to Cuba in support of the defense of insanity. The trial court ruled that she was not competent as a witness. She did not take the stand. The court apparently reasoned that if the wife were not competent to stand trial she was not competent to testify. The court said:

> How do you prosecute a mentally incompetent person for testifying untruthfully? I don't know. I never heard of a case where a witness was ever indicted or prosecuted, who was incompetent, for perjury. There has to be some limit to

1. "[U]nder the new Federal Rules of Evidence it is doubtful that mental incompetence would even be grounds for disqualification of a prospective witness. Rule 601 provides that '[e]very person is competent to be a witness except as otherwise provided in these rules,' and nowhere is mental competence mentioned as a possible exception. The Notes of the House Committee on the Judiciary state that one effect of Rule 601 is to abolish mental capacity as a ground for rendering a person incompetent as a witness. The Advisory Committee in their Notes on the Proposed Rules took a similar view, observing that the question of capacity was one 'particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence'." *U. S. v. Roach,* 590 F.2d 181, 185–86 (5th Cir. 1979) (footnotes omitted).

2. BY MR. SHEROUSE:
Q. Doctor, do you believe Mrs. McRary understands the difference between telling the truth and lying?

safeguard the actual truthfulness of the testimony at the trial.

We hold that the trial court was too peremptory in ruling that Mrs. McRary could not testify. The defense should have been afforded an opportunity to make a proffer and a record to determine the witness' ability to testify.[1] We have nothing to review except a short supplemental transcript in which a psychiatrist states that Mrs. McRary is incompetent to stand trial, and his written report is admitted but not included in the transcript. However, the psychiatrist did testify that she understood the concept of the oath.[2]

We discuss now the claimed error that relevant evidence was wrongfully excluded.

The defense called Dr. Marquit who testified in part as follows:

> "Q. Doctor, with a reasonable degree of psychological certainty, do you have an opinion whether or not, as a result of this mental disease, Clifford McRary lacks substantial capacity to either understand the wrongfulness of his acts or to conform to the requirements of the law?
>
> A. Well, I think he understands that the act was wrong, but I don't think he could have prevented himself from conforming.
>
> Q. Doctor, are you familiar with the term 'folie à deux'?
>
> A. I would say she understands if she was placed under oath, I think she understands the concept.
>
> THE COURT: That is not the test for competency.
>
> MR. SHEROUSE: From my point of view, it is to see whether he can tell whether or not she can be called as a witness during the trial or not.
>
> THE COURT: If she is declared incompetent, she can't be called as a witness, I'll tell you that right now.
>
> MR. SHEROUSE: That is why I'm asking him the different standards.
>
> THE COURT: I am ruling that right now.
>
> MR. SHEROUSE: Would you care to hear argument on it? This is the only factual witness I have available.
>
> THE COURT: Don't make any arguments to me, Mr. Sherouse, please.

A. Yes.

Q. What does the term mean?

A. That is a French word that is used to describe a certain condition which we see in which two people share in the same fantasy.

Q. I notice you used that term in your report. Can you explain why?

A. Yes. Because I have had the opportunity to examine his wife, also. And she shared some of his fantasies.

[U. S. Attorney]: Objection.

THE COURT: I will sustain the objection to anything whatsoever about his wife. She is not being tried in this law suit.

Q. How does this relate to Clifford McRary's action in going through this, Doctor?

[U. S. Attorney]: Objection.

THE COURT: I will sustain the objection to that question as it relates to Patricia McRary.

Transcript, 89–91.

The court did not permit the defense to offer any testimony from Dr. Marquit or Dr. Stillman with respect to the effect of the mental illness, folie à deux, upon the defendant.

Folie à deux, the psychosis of association, has been defined as 'the transference of delusional ideas and/or abnormal behaviour from one person to one or more individuals who have been in close association with the primary affected person'. At least three conditions have been regarded as pre-requisite for its diagnosis: (a) definite evidence that the partners have been intimately associated, (b) identical content of the delusional ideas in both the patients, and (c) unequivocal evidence that the partners share, support and accept each other's delusions.

In most cases of folie à deux one person (the dominant partner or the *Principal*) initiates the delusions and the other (the submissive partner or the *Associate*) acquires them secondarily.

Soni and Rockley, "Socio-Clinical Substrates of Folie à Deux," *Brit. J. Psychiat.* (1974), at p. 230.

We will not prolong this opinion by a discussion of this unusual type of mental illness. The proffer of evidence showed that Mrs. McRary had a longstanding mental illness which was apparently recognizable to persons who knew her but not to her husband. The proffer was that the testimony of the doctors would show that the couple jointly suffered the condition of folie à deux and that this circumstance affected Mr. McRary's mental condition at the time of the crime.

Any discussion of a court's ruling excluding evidence must start with consideration of Rules 401, 402, and 403 of the Federal Rules of Evidence. There is no question but that evidence from Mrs. McRary and Drs. Marquit and Stillman would have shed additional light upon the defendant's mental status at the time of the commission of the crime. In *Mims v. United States*, 375 F.2d 135 (5th Cir. 1967), this court said "The sound rule is that the issue of insanity, when raised as a defense in a criminal case, should be determined by the jury from all the evidence, . . ." Rule 402 provides that relevant evidence is generally admissible, while Rule 403 permits relevant evidence to be excluded under certain circumstances, none of which are met here.

█ Further, the law is clear in this circuit that all evidence relevant or pertinent to the issue of insanity should be admitted. This is in keeping with the philosophy of letting in all facts which might be helpful to the jury in making the final determination of the criminal responsibility of the accused. *Blake v. United States*, 407 F.2d 908 (5th Cir. 1969) (en banc) (Bell, J., for a unanimous court). This principle in *Blake* has been reaffirmed in *United States v. Davis*, 523 F.2d 1265, 1267 (5th Cir. 1975): "This conclusion is reinforced by consideration of the jurisprudence of this circuit, which is strongly to the effect that where a defense of insanity is raised, the trial court should be liberal in its rulings on the admissibility of evidence bearing on that issue." *Blake* was again quoted with approval in *United States v. Lopez*, 543 F.2d 1156 (5th

Cir. 1977). We therefore conclude that this evidence should have been admitted.

■ Appellant also argues that his Fifth Amendment right not to be twice put in jeopardy for the same offense is violated by a federal prosecution following punishment by a foreign sovereign for the same acts. A similar argument was rejected by this court in *United States v. Martin*, 574 F.2d 1359 (5th Cir. 1978), *cert. denied* 439 U.S. 967, 99 S.Ct. 456, 58 L.Ed.2d 425. There the Court concluded that "[t]he rule of *Abbate* [*v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959), holding that a federal prosecution is not barred by a prior state prosecution of the same person for the same acts,] applies *a fortiori*." 574 F.2d at 1360. Just as in *Martin*, we also decline to accept the appellant's suggestion that, as a result of understandings between the Governments of the United States and Cuba, these successive prosecutions should be treated as if they were obtained by the same sovereign. Although the *Abbate* court in *Bartkus v. Illinois*, 359 U.S. 121, 123–24, 79 S.Ct. 676, 678, 3 L.Ed.2d 684 (1959), observed that such a conclusion might result upon a showing that an earlier state prosecution was "merely a tool of the federal authorities" or "was a sham and a cover for a federal prosecution," appellant has made no such showing here.

■ Finally, appellant contends that venue was not proper in the Southern District of Florida under the provisions of 18 U.S.C. § 3238. That section provides that trial for offenses "committed upon the high seas . . . shall be in the district in which the offender . . . is arrested or is first brought . . ." Appellant concedes that this section applies in that the offense in question was committed on the high seas and the defendant was arrested upon his return to this country in the Southern District. Br. for Appellant, pp. 10–11. He argues instead that the outstanding indictment by a Southern District grand jury, which supported his arrest upon his return to this country, was invalid under the subsequent portion of § 3238. That portion of § 3238 provides in effect that, in the event the defendant is not arrested within or brought into the jurisdiction of a U. S. district court, "an indictment . . . *may* be filed in the district of the last known residence of the offender . . . or if no such residence is known . . . *may* be filed in the District of Columbia." (Emphasis added.) The legislative history behind this provision, however, illustrates the permissive nature of the language providing for the place for the return of indictments. That language was intended to relieve the prosecution of the burden of demonstrating that an offender who remained without the territorial jurisdiction of the U. S. was a "person fleeing from justice" under 18 U.S.C. § 3290, for purposes of tolling any applicable statute of limitations. *See* U.S.Code Cong. and Admin.News, 1963, pp. 660–663. In addition, the transfer of the case from the Miami Division, where appellant was arrested, for trial in the Key West Division, while perhaps inconvenient for him, was certainly made "with due regard to the convenience of . . . the witnesses," F.R.Crim.P. 18, and we find no abuse of discretion here.

VACATED and REMANDED for new trial.