# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10913

United States Court of Appeals
Fifth Circuit

**FILED**

January 10, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

DAVID PIPER, JR., also known as "D"; CARLOS CORTINAS,

> Defendants - Appellants

_____

Appeals from the United States District Court
for the Northern District of Texas

_____

Before JOLLY, DENNIS, and HIGGINSON, Circuit Judges.

PER CURIAM:

David Piper, Jr. and Carlos Cortinas were convicted by a jury of conspiracy to possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B) from approximately March 2015 through January 2016. The district court sentenced Piper to 235 months of imprisonment and five years of supervised release and Cortinas to 168 months of imprisonment and five years of supervised release. On appeal, Piper challenges multiple aspects of his conviction and sentence. Both he and Cortinas also contend that the district court erred in instructing the jury. We AFFIRM.

No. 17-10913

## I. Factual and Procedural Background

In 2015, the Drug Enforcement Administration (DEA) initiated an investigation into the drug distribution activities of Robert Rosales in and around the Dallas/Fort Worth area in Texas. The investigation revealed that Rosales obtained methamphetamine from Mexico for further distribution. Jose Albino Garza, Rosales's friend, often assisted Rosales with his drug-trafficking activities, including driving Rosales to conduct drug transactions. In 2013 or 2014, Rosales began distributing methamphetamine to Cortinas, his childhood friend. Cortinas purchased methamphetamine by the pound to be distributed to at least three individuals in Missouri, including Piper.

In August 2015, Piper traveled to Fort Worth to purchase three pounds of methamphetamine from Rosales through Cortinas. In September 2015, Cortinas, Rosales, and Garza traveled to Bolivar, Missouri, to deliver three pounds of methamphetamine to Piper. After receiving the methamphetamine, Piper called Cortinas to complain about the quality of the drugs, and Rosales agreed to exchange the methamphetamine and directed Garza and Chadwick Hernandez to bring Piper another three pounds. On September 8, 2015, while returning to Fort Worth after exchanging the methamphetamine with Piper, Garza and Hernandez were pulled over, discovered with approximately 2.85 pounds of methamphetamine, and arrested.

While Garza was detained, Piper obtained more methamphetamine directly from Rosales. On three occasions, Piper traveled to Arlington, Texas, each time obtaining three additional pounds of methamphetamine. When Garza was released from custody, he delivered methamphetamine to Piper in Missouri on three more occasions, again selling him three pounds of methamphetamine each time, for a total of nine additional pounds. On another

occasion, Piper traveled to Arlington, Texas, to meet Garza and bought three additional pounds of methamphetamine.

Rosales and Garza were arrested in January 2016, the same day Garza was scheduled to deliver three more pounds of methamphetamine to Piper in Missouri. Piper attempted to contact Rosales and Garza by text message after their arrest. In September 2016, a federal arrest warrant issued for Piper, who was eventually arrested in November. Piper was shown a photograph of Cortinas and stated that Cortinas "looked familiar," but he did not know his name or have a relationship with him. Cortinas was arrested on January 5, 2017. Cortinas admitted that he had known Rosales a long time and that he knew Piper but stated that he had not spoken to Piper in over a year and did not put Rosales in contact with Piper.

Piper and Cortinas were originally indicted for conspiracy to possess with intent to distribute 50 grams or more of a mixture of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). By subsequent superseding indictment, they were charged instead with conspiracy to possess with intent to distribute 500 grams or more of a mixture of methamphetamine in violation of 21 U.S.C. § 846 and § 841(a)(1) and (b)(1)(A). In separate proceedings, Rosales and Garza pleaded guilty to other related charges and agreed to cooperate with the Government against Piper and Cortinas.

A few days before the trial was set to begin, Piper filed applications for writs of habeas corpus ad testificandum for two potential defense witnesses: Spencer Glen Ely[1] and Kiriakis Castle.[2] The next day, the district court ordered the Government to issue an Attorney Special Request (ASR) to produce

---

[1] Ely was a defendant in an unrelated criminal case pending in the Western District of Texas. He was charged with sending mail threatening to injure United States District Judge Robert Junell and President Barack Obama.

[2] Castle was a co-conspirator who purchased methamphetamine from Rosales.

Ely and Castle.  Castle indicated through counsel that he would invoke his Fifth Amendment right against self-incrimination.  Additionally, the Government notified the court that Ely was undergoing an examination to determine whether he was competent to stand trial and could not be produced until the study was complete, or unless the judge who ordered the study communicated directly with Ely's physician and ordered Ely released.  Piper filed an opposed motion to continue the trial until Ely was available to testify, which the district court denied.

Piper's and Cortinas's joint trial was held on March 20, 2017.  Both Garza and Rosales testified and identified Piper in court as the person that bought methamphetamine from them in Missouri, and Rosales also identified Cortinas.  Garza testified that he sold three pounds of methamphetamine to Piper on multiple occasions and authenticated cell phone and GPS evidence submitted into the record connecting Piper to the drug transactions.  Rosales then testified that he met Piper through Cortinas; that Piper originally bought methamphetamine from Cortinas but eventually cut Cortinas out and bought directly from Rosales; that Rosales traveled to Piper's home in Missouri with Garza and Cortinas to deliver methamphetamine; that Rosales agreed to send Garza to exchange three pounds of methamphetamine after Piper complained about its quality; that, after Garza was arrested, Piper bought methamphetamine directly from Rosales in Arlington, Texas; that Garza resumed selling methamphetamine to Piper after he was released from custody four more times; and that, on the day Rosales and Garza were arrested in January 2016, Garza was supposed to go to Missouri to sell Piper methamphetamine.  Both Garza and Rosales testified that they hoped to receive a lesser sentence in exchange for cooperating with the Government.  Additionally, the defense called Castle to the witness stand, but he was

dismissed after he invoked his Fifth Amendment right against self-incrimination.

The jury found Piper and Cortinas guilty as to "Count One of the Indictment." Piper then filed an opposed motion for a new trial, which the district court denied. At sentencing, the district court adopted the factual findings and calculations in the presentence report (PSR). Piper's resulting total offense level was 38, his criminal history was I, and his Guidelines range was calculated at 235 to 293 months. Piper was sentenced to 235 months in prison, five years of supervised release, and a $100 special assessment. Cortinas was sentenced to 168 months of imprisonment, five years of supervised release, and ordered to pay a special assessment of $100. Piper and Cortinas appealed.

## II. Standard of Review

We generally "review violations of the compulsory process clause de novo." *United States v. Tuma*, 738 F.3d 681, 688 (5th Cir. 2013). But when a defendant does not raise a compulsory-process objection in the district court, we review for plain error. *See United States v. Gonzales*, 436 F.3d 560, 577 (5th Cir. 2006). A district court's denial of a continuance is reviewed for abuse of discretion. *See United States v. Mesquiti*, 854 F.3d 267, 275 (5th Cir. 2017); *see also United States v. Garcia-Pagan*, 804 F.3d 121, 124 (1st Cir. 2015) (reviewing continuance ruling for abuse of discretion even when defendant asserts a compulsory-process claim). We also review a district court's denial of a motion for a new trial for abuse of discretion. *See Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016). A district court's factual determination regarding the quantity of drugs used to establish a base offense level for sentencing purposes is reviewed for clear error. *See Turner*, 319 F.3d at 724. Factual findings are "not clearly erroneous if they are plausible in light of the record as a whole."

No. 17-10913

*Id.* (citation omitted).  Generally, we review jury instructions, including the verdict form, "for abuse of discretion, examining whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them."  *See United States v. Spalding*, 894 F.3d 173, 187 (5th Cir. 2018) (citation omitted).

### III. Discussion

### A. Piper's Claims

### 1. Fifth and Sixth Amendments

Piper argues that he was deprived of due process and compulsory process under the Fifth and Sixth Amendments when the Government failed to comply with the district court's order to produce Ely as a witness at trial.  He asserts that Ely was competent and willing to provide material and favorable testimony about statements Castle made that would have contradicted testimony from Rosales and Garza.  The Government disagrees, contending that Ely's testimony would have been inadmissible and that its efforts to secure Ely's presence sufficiently comported with the Compulsory Process Clause.

Because Piper did not raise his compulsory-process claim below, we review for plain error.  *See Gonzales*, 436 F.3d at 577.  To prevail, Piper must demonstrate (1) an error (2) that is "clear or obvious, rather than subject to reasonable dispute," and (3) that affects his substantial rights.  *See Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Olano*, 507 U.S. 725 (1993)).  If all three prongs are satisfied, this court has discretion to remedy the error "only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *See id.*

The Due Process Clause "guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of

6

justice.'" *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982) (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)); U.S. CONST. AMEND. V.  Due process includes the right to present witnesses to establish a defense.  *See Washington v. Texas*, 388 U.S. 14, 19 (1967).  The Compulsory Process Clause of the Sixth Amendment ensures that "criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt."  *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 56 (1987)); U.S. CONST. AMEND. VI.  To demonstrate a constitutional violation under either due process or compulsory process based on the deprivation of witness testimony, a defendant "must make some plausible showing of how the[] testimony would have been both material and favorable to his defense." *United States v. Villanueva*, 408 F.3d 193, 200 (5th Cir. 2005) (quoting *Valenzuela–Bernal,* 458 U.S. at 867).  In exercising the right to present witnesses, a defendant "must comply with established rules of . . . evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *See United States v. John*, 597 F.3d 263, 276–77 (5th Cir. 2010).

### a. Ely's Testimony

Ely was a witness in an unrelated criminal case who was housed in the same facility and overheard a conversation between Castle and Piper while all three men were in jail.  Piper asserts that Ely would have testified about the conversation he overheard, which Ely recounted in the following written statement that he provided to Piper before trial:

> I was in the upstairs catwalk talking to KC Kiriak Castle when Mr. Piper was walking by and KC said to Mr. Piper Hey we got something in common come in my cell I wanna show you something.  KC gets out this paperwork and shows it to Mr. Piper. KC said we're all in this conspiracy because of Garza.  Mr. Piper

said I don't know any of you guys and my case is still open and I can't talk about it. KC said I just wanna tell you that you got fucked on this deal. Mr. Piper said what do you mean and KC said Garza and Hernandez wasn't coming back from your house with that 3 pounds of meth they were coming back from another dudes (sic) that lives in Missouri that Rosales was buying a truck from and the dude was getting payments on the truck in dope. KC said the dude Rosales was buying this truck from is a high roller he goes threw (sic) several keys a week and sense (sic) Rosales has been in jail his brother has taken over his busseness (sic) so Rosales didn't want to give him up because that's his main buyer. Piper said who is this Garza guy. KC said that is Rosales right hand man and Garza does whatever Rosales tells him. Rosales got word to Garza to throw you under the bus and in exchange Rosales's brother will take care of Garza's family. Piper said how did they get my name and address. KC said a dude by the name of Cortinas got dropped at your house to met (sic) Cortinas's girlfriend's friend and she drove him back to TX. Garza had your address in his GPS. Cortinas said your (sic) just a casualty you got framed because they had to come up with someone to blame for the 3 pounds that was found in Oklahoma. Garza and Rosales will get a Rule 35 after they testify against you. Piper asked why did they say that Garza came to my house 3 times and Rosales said I met them at a motel in TX and at a (sic) address in TX I've never been to TX before. KC said they have to make you look like a bigger player in this. Piper said how do you know all of this. KC said because when Garza was in here I confronted him about it, he denied setting me and the twins up but said fuck Hernandez he was the stupid motherfucker driving when we got pulled over and Rosales didn't really want to include Cortinas but it was the only way to link us to Piper. I've been in trouble a long time and I've seen so many people get railroaded in these bogus conspiracys (sic) people get 30-40 years for not pleading out and it's wrong. I don't know Mr. Piper but I am willing to testify as to what I heard because it isn't right that Rosales and Garza can get there (sic) sentence cut in half while Piper takes the fall.

> Thank you
> Spencer Ely [prisoner no.] 85716380

Piper argues that this testimony would have contradicted Rosales's and Garza's testimony by potentially implicating John Henry Turner, the

individual Castle discussed who sold Rosales a truck, as Rosales's main buyer in Missouri.[3]  The Government argues that Ely's testimony was inadmissible hearsay.

### b. Admissibility of Ely's testimony

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *See United States v. Reed*, 908 F.3d 102, 119 (5th Cir. 2018) (citing FED. R. EVID. 801(c)).  Hearsay is not admissible unless a statute or rule provides otherwise. *See United States v. Demmitt*, 706 F.3d 665, 671 (5th Cir. 2013) (citing FED. R. EVID. 802).  Piper argues that Castle's statements are admissible as statements against penal interest under Rule 804(b)(3).[4]

The rule against hearsay does not render a declarant's statement against interest inadmissible.   FED. R. EVID. 804(b)(3).  Rule 804(b)(3) requires that "the declarant be unavailable, the statement must subject the declarant to criminal liability such that a reasonable person would not have made the statement unless he believed it to be true, and the statement must be corroborated by circumstances clearly indicating trustworthiness." *United States v. Bell*, 367 F.3d 452, 466 (5th Cir. 2004) (citing *United States v. Sarmiento–Perez,* 633 F.2d 1092, 1101 (5th Cir. 1981)).  The first requirement

---

[3] Piper contends that Ely's testimony was admissible to impeach Rosales's and Garza's character for truthfulness. *See* FED. R. EVID. 608(a).  However, Rule 608 is subject to limits on reliability and relevance, and a witness must be acquainted enough with the individual to have formed a reliable opinion about his character. *See United States v. Garza*, 448 F.3d 294, 297 (5th Cir. 2006).  The record does not demonstrate that Ely had knowledge of Rosales's and Garza's character for untruthfulness.  Additionally, for reasons described below, it is not clear that Ely's hearsay statements would have been admissible.

[4] The parties dispute whether Ely would have been a competent witness under Federal Rule of Evidence 601, which provides that "[e]very person is competent to be a witness unless these rules provide otherwise."  FED. R. EVID. 601.  Piper is correct that Ely's competency examination was not a basis for excluding his testimony at Piper's trial under Rule 601. *See United States v. McRary*, 616 F.2d 181, 183 (5th Cir. 1980) (a person may still be competent to serve as a witness under Rule 601 even if he was determined not competent to stand trial).  Even so, Piper must show that Castle's statements, through Ely, were admissible.

is met here because the declarant, Castle, invoked his Fifth Amendment privilege against self-incrimination and was therefore unavailable to testify. *See* FED. R. EVID. 804(a)(1) (a declarant is unavailable as a witness if the declarant invokes a privilege); *United States v. Young Bros., Inc.,* 728 F.2d 682, 690 (5th Cir. 1984) ("[I]t is clear that a witness who is unavailable because he has invoked the Fifth Amendment privilege against self-incrimination is unavailable under the terms of 804(a)(1)").

As to the second requirement, this court does not "read Rule 804(b)(3) to be limited to direct confessions of guilt. Rather, by referring to statements that 'tend' to subject the declarant to criminal liability, the Rule encompasses disserving statements by a declarant that would have probative value in a trial against the declarant." *See United States v. Thomas*, 571 F.2d 285, 288 (5th Cir. 1978). Some of Castle's statements tend to show that Castle knew numerous and specific details about the drug trafficking conspiracy, including the names of the conspirators, the hierarchy within the conspiracy, where Hernandez and Garza were returning from when they were pulled over by law enforcement, and the drug quantities involved. *See Thomas*, 571 F.2d at 288. However, as Ely's written statement reveals, Castle stated that he knew "all of this" information by confronting Garza while incarcerated:

> Piper said how do you know all of this. KC said because when Garza was in here I confronted him about it, he denied setting me and the twins up[.]

Thus, Castle's statements could be subject to multiple interpretations. On the one hand, Castle's statements could be interpreted as an attempt to disclaim all participation in the conspiracy, and to relay knowledge of the conspiracy to Piper that he later learned through the criminal proceedings against him and by confronting Garza in prison about the alleged set up. Such statements would *serve* Castle's penal interests rather than subject him to criminal

No. 17-10913

liability, as Castle would be portrayed as the innocent victim of a set up. Under this interpretation, Castle's statements would be inadmissible under Rule 804(b)(3). Alternatively, Castle's statement about confronting Garza could be construed narrowly as the source of his knowledge only as to certain aspects of the conspiracy, such as Garza's and Rosales's plan to set up Piper. Under this interpretation, some of Castle's other statements reflecting knowledge of the conspiracy could still be considered statements against his penal interest and would therefore be admissible. *See Williamson v. United States*, 512 U.S. 594, 600–01 (1994) (finding part of a statement admissible under Rule 804(b)(3) and reasoning that "the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory."); *see also United States v. Castelan*, 219 F.3d 690, 694 (7th Cir. 2000) ("Under *Williamson,* the district court must consider whether each statement, not just the confession as a whole, was truly self-inculpatory.").

Third, Rule 804(b)(3) requires that a statement be corroborated by circumstances clearly indicating trustworthiness. *See Bell*, 367 F.3d at 466. "[T]he statements must bear adequate 'indicia of reliability,' such that 'adversarial testing would be expected to add little, if anything, to the statements' reliability.'" *Id.* (citing *Lilly v. Virginia,* 527 U.S. 116, 124–25 (1999)). The record substantiates some of Castle's statements and indicates some level of trustworthiness.[5] However, the fact that some of Castle's

---

[5] For example, at Piper's and Cortinas's trial, Rosales testified that Castle was his client, that he supplied Castle with drugs, and that he had known Castle "about a year." Furthermore, Garza testified at trial that he had met Castle "like once or twice," and that he had spoken to Castle for "about an hour, two hours" about Garza's "paperwork" while both men were incarcerated in the same facility. On the other hand, Garza clearly contradicted Castle's statements when he denied talking to Castle about Piper's and Cortinas's case or about setting up his codefendants. Thus, although Castle's statements bear some indicia of reliability, they are somewhat contradicted by other evidence in the record. Therefore, it is

11

statements direct criminal liability toward others cuts against their trustworthiness. *See United States v. Hale*, 685 F.3d 522, 540 (5th Cir. 2012) (where a declarant was likely to become a co-defendant, "his statements that tend[ed] to implicate others at least as much as himself [were] less credible and more suspicious than other out-of-court statements."); *see also Williamson*, 512 U.S. at 603 ("Even the confessions of arrested accomplices may be admissible if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor."). Additionally, we cannot conclude that the circumstances under which the statements were made entitle them to additional credibility. *See Thomas*, 571 F.2d at 290 (noting that a declarant's statement exculpating the defendant was entitled to additional credibility based on the circumstances in which it was made "because the possibility of fabrication . . . [was] slight"). Castle made the statements to Piper while the two were incarcerated in the same facility, where it would have been possible to devise a plan to make a mutually beneficial statement casting them as the innocent victims of a set up.

Because it is not clear or obvious that Castle's hearsay statements were admissible, Piper cannot make the necessary showing that his due process and compulsory process rights were clearly violated.[6] *See Puckett*, 556 U.S. at 135;

---

not clear that "adversarial testing would be expected to add little, if anything, to the statements' reliability." *See Bell*, 367 F.3d at 466.

[6] Piper contends that the Government could have produced Ely through other efforts, such as by facilitating communication between the court that ordered Ely's competency examination and Ely's physician, or by issuing a Rule 17(b) subpoena. However, the record does not reflect that Piper asked the Government for further assistance in securing Ely through any of the alternative means he now proposes. *Cf. United States v. Crook*, 479 F. App'x 568, 578 (5th Cir. 2012) (finding no constitutional violation where the government did not subpoena a witness, but did not make the witness unavailable, and fully cooperated when the defendant actually asked for assistance). Additionally, given the foregoing discussion about the admissibility of Ely's testimony, any additional efforts by the Government to compel Ely to testify would also have been unnecessary.

*Taylor*, 484 U.S. at 410 ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").

## 2. Motion to continue the trial

Piper argues that the district court abused its discretion by denying his motion to continue the trial so that Ely could complete his competency examination and testify.  Piper moved to continue the trial on Friday, March 17, 2017, three days before the trial was set to begin on Monday, March 20.  The Government opposed the motion, citing, inter alia, the inadmissibility of Ely's testimony.  The court denied the motion for the reasons given by the Government.

A district court has broad discretion in deciding whether to grant a request for a continuance, and this court reviews "only for an abuse of that discretion resulting in serious prejudice." *United States v. Stalnaker*, 571 F.3d 428, 439 (5th Cir. 2009) (quoting *United States v. German,* 486 F.3d 849, 854 (5th Cir. 2007)).  When a defendant requests a continuance based on an unavailable witness, he must demonstrate: "(1) that due diligence was exercised to obtain the attendance of the witness; (2) that the witness would tender substantial favorable evidence; (3) that the witness will be available and willing to testify; and (4) that denial of the continuance would materially prejudice the movant." *United States v. Hickerson*, 489 F.3d 742, 745 (5th Cir. 2007) (citing *United States v. Olaniyi-Oke,* 199 F.3d 767, 771 (5th Cir. 1999)).  Because Ely's testimony was not clearly admissible, Piper cannot show that denying the motion to continue would have resulted in serious prejudice, and the district court did not abuse its discretion by denying the motion.

No. 17-10913

### 3. Motion to vacate and order a new trial

Piper next contends that the district court abused its discretion by denying his motion for a new trial. *See United States v. Erwin*, 277 F.3d 727, 731 (5th Cir. 2001). The district court denied the motion without specifying its reasons. Piper now argues that he was entitled to a new trial based on new evidence. Federal Rule of Criminal Procedure 33 permits a district court to grant a new trial upon a defendant's motion "if the interest of justice so requires." FED. R. CRIM. P. 33(a). To justify a new trial on the basis of newly discovered evidence, a defendant must show: "(1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal." *See United States v. Wall*, 389 F.3d 457, 467 (5th Cir. 2004).

Piper contends that the following sentence from his PSR constituted new evidence: "Rosales often requested Garza to assist in his drug trafficking activities such as the retrieval of a truck from Oklahoma."[7] He argues that this statement, suggesting that Turner (and not Piper) was Rosales's main drug buyer in Missouri "would probably produce an acquittal." However, the statement from the PSR is vague and lacks foundation. It is not clear whether it implicates Turner in the drug trafficking activities, or whether retrieval of the truck was merely necessary for Rosales and his co-conspirators to carry out their drug trafficking activities. For these reasons, Piper cannot prove that the evidence, if introduced at a new trial, would "probably produce an

---

[7] Though the PSR states that Rosales bought a truck in Oklahoma, by all accounts, he purchased a truck from Turner in Missouri.

14

acquittal." *See United States v. Ramirez*, 628 F. App'x 15, 17–18 (2d Cir. 2015) (affirming the district court's denial of a motion for a new trial where a PSR that was withheld would not have changed the result of the trial).  The district court's denial of Piper's motion was not an abuse of discretion.  *See Erwin,* 277 F.3d at 731.

### 4. Piper's Sentencing Guidelines range

Piper argues that the district court erred in calculating his Sentencing Guidelines range.  We review a district court's "interpretation or application of the Sentencing Guidelines" de novo and factual findings for clear error.  *See United States v. Hernandez-Galvan*, 632 F.3d 192, 196 (5th Cir. 2011).  "A presentence report generally bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations." *See United States v. Nava,* 624 F.3d 226, 231 (5th Cir. 2010).  A district court may adopt the PSR's facts "without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable." *See United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (quoting *United States v. Trujillo,* 502 F.3d 353, 357 (5th Cir. 2007)).

Piper's PSR stated that he was accountable for 13.6 kilograms of methamphetamine, providing a base offense level of 34.  Piper was given a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(5) for an offense involving "the important of amphetamine or methamphetamine" on the basis that the methamphetamine he distributed was imported from Mexico.[8]  Piper objected

---

[8] Piper was also given a second two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(12) for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance" on the basis that he "utilized his residence to store and distribute methamphetamine."  He does not sufficiently brief a challenge to the district court's

to these calculations below, and he now claims the PSR's calculations relied on "conflicting, contradictory" testimony by Rosales and Garza that lacked sufficient indicia of reliability.

The district court overruled Piper's objection to the drug quantity attributable to him on the basis that there was sufficient cell phone record evidence and witness testimony corroborating the 13.6-kilogram amount. We agree. In August 2015, Piper traveled to Fort Worth, Texas, to purchase three pounds (1.36 kilograms) of methamphetamine from Cortinas. In September 2015, he purchased three pounds (1.36 kilograms) of methamphetamine from Garza, Rosales, and Cortinas, which was later exchanged for another three pounds (1.36 kilograms) of higher quality methamphetamine. While Garza was detained in Oklahoma, Piper traveled to Arlington, Texas, on three occasions to buy three pounds of methamphetamine each time (4.08 kilograms). Piper resumed buying three-pound increments of methamphetamine directly from Garza on three occasions (4.08 kilograms), twice in Missouri and once in Texas. Phone records also support that Piper was supposed to buy additional methamphetamine on the day Rosales and Garza were arrested, presumably in the same increment of three pounds (1.36 kilograms). *See United States v. Valdez*, 453 F.3d 252, 267 (5th Cir. 2006) (a district "court may extrapolate the quantity [of drugs] from any information that has sufficient indicia of reliability to support its probable accuracy") (internal quotation marks omitted); *see also United States v. Banda*, 236 F. App'x 955, 956 (5th Cir. 2007) ("The district court is permitted to make reasonable estimates of drug quantities and may make reasonable inferences

---

application of the § 2D1.1(b)(12) enhancement. Therefore, he has abandoned any such claim. *See Boyer v. Vannoy*, 863 F.3d 428, 445 (5th Cir. 2017) (a defendant abandons an argument where he has offered it in a brief heading, without any further elaboration).

from the facts."). Together, these transactions total 13.6 kilograms of methamphetamine. Thus, the district court did not clearly err by relying on the PSR's calculation of the drug quantity attributable to Piper. *See Turner*, 319 F.3d at 724 (a district court's factual findings are "not clearly erroneous if they are plausible in light of the record as a whole").

The PSR also recommended a two-level enhancement pursuant to § 2D1.1(b)(5) based on a DEA report from 2015, finding that Rosales received methamphetamine imported from Mexico for further distribution. Piper objected at sentencing, and the district court overruled the objection with little explanation, stating: "I think the evidence establishes that the methamphetamine was imported from Mexico." Piper now argues that this was conclusory. However, the record demonstrates that the DEA initiated an investigation into Rosales's drug distribution activities in 2015, that Rosales's drug distribution conspiracy in and around Dallas and Fort Worth, Texas, began in March 2015, and that Piper bought large quantities of methamphetamine from Rosales in Texas and Missouri between August and September of 2015. Accordingly, the district court's application of the two-level enhancement for importation was not clearly erroneous. *See Turner*, 319 F.3d at 724.

### B. Joint Claim

Cortinas and Piper argue that their convictions should be vacated on the basis that the district court's jury charge and verdict form were ambiguous, inconsistent, and incorrectly stated the law. The parties concede that we review for plain error, as they did not object to the jury charge below. *See Puckett*, 556 U.S. at 135. "A jury instruction must: (1) correctly state the law, (2) clearly instruct the jurors, and (3) be factually supportable." *United States v. Fairley*, 880 F.3d 198, 208 (5th Cir. 2018) (citing *United States v. Phea*, 755

F.3d 255, 266 (5th Cir. 2014)). "[S]pecific jury instructions are to be judged not in isolation, but must be considered in the context of the instructions as a whole and the trial record." *See Phea*, 755 F.3d at 266 (internal citations and quotation marks omitted). "Verdict forms are considered part of the jury instruction, and we evaluate the combined effect on the jury." *See Fairley*, 880 F.3d at 208. "Jury instruction error 'does not amount to plain error unless it could have meant the difference between acquittal and conviction.'" *Id.* (quoting *United States v. McClatchy*, 249 F.3d 348, 357 (5th Cir. 2001)); *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) ("It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court."). Piper and Cortinas raise three arguments, which we consider in turn.

First, they claim the district court's jury charge departs from the Fifth Circuit's pattern jury instruction for § 841(a)(1). *See* PATTERN CRIM. JURY INSTR. 5TH CIR. 2.93 (2015). In laying out the elements of a § 841(a)(1) violation, Piper and Cortinas claim that the district court improperly amended the phrase "the defendant" to state "the defendant or coconspirator" in the first and third elements,[9] which relieved the Government of its burden to prove the existence of a conspiracy in the first place. We disagree. Both orally and in its

---

[9] Piper and Cortinas contend that the district court departed from the Fifth Circuit's Pattern Jury Instructions for § 841(a)(1) as follows:

> Section 841(a)(1), makes it a crime for anyone knowingly or intentionally to possess a controlled substance with intent to distribute it. . . . For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>> *First*: That the defendant **or coconspirator** knowingly possessed a controlled substance . . .
>> *Third*: That the defendant **or coconspirator** possessed the substance with the intent to distribute it. . . .

(emphasis added).

No. 17-10913

written charge to the jury, the district court instructed the jury that the government must prove the elements of a conspiracy beyond a reasonable doubt. The district court added the language "or coconspirator" within the context of explaining the Government's additional burden to prove the object of the conspiracy; here, § 841(a)(1):

> The government need not prove that the defendant himself possessed a controlled substance with the intent to distribute it; the government need only prove that the defendant conspired with another person to do so. Nevertheless, so that you can understand the object of the conspiracy that the government has alleged, I will explain the elements of the crime of possession with intent to distribute a controlled substance.

By instructing the jury as to the object of the conspiracy, the district court did not plainly err.[10] *See United States v. Gaytan*, 74 F.3d 545, 553 (5th Cir. 1996) (holding that the district court did not abuse its discretion by departing from a Pattern Jury Instruction to offer a more precise one). *Cf. Fairley*, 880 F.3d at 209 (holding that the district court's departure from the Fifth Circuit's pattern language for 18 U.S.C. § 641 was plain error, where the court mixed the verbs drawn from § 641's "stealing" paragraph with verbs drawn from § 641's "receiving" paragraph and fashioned an incorrect element of intent).

Second, Piper and Cortinas contend that the jury instructions require reversal because the district court instructed the jury that a § 841(a)(1) violation occurs when "the quantity of the [methamphetamine] substance was

---

[10] Piper and Cortinas argue that a coconspirator's knowledge or possession is irrelevant to whether a violation of § 841(a)(1) occurred. However, "[i]t is settled that 'an overt act of one partner may be the act of all without any new agreement specifically directed to that act.'" *See Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946). To the extent they argue that the district court failed to provide a sufficient *Pinkerton* instruction, any error would likely be harmless. *See United States v. Elizondo*, 920 F.2d 1308, 1317 (7th Cir. 1990) (holding that the district court's inadequate *Pinkerton* instruction was harmless error, as the Government's case did not rely solely on the *Pinkerton* doctrine of vicarious co-conspirator liability and alternative theories of direct and vicarious liability existed).

**at least 500 grams**," whereas the relevant provision of the statute actually states "**500 grams or more**." *See* 21 U.S.C. § 841(b)(1)(A)(viii) (emphasis added). We find no meaningful distinction between the district court's language and § 841(b)(1)(A)(viii) and, even assuming the district court's inconsistent language was error, it was not plain and did not affect Piper's or Cortinas's substantial rights.

Lastly, Piper and Cortinas argue that the district court's instructions and the jury verdict form provided jurors with three different recitations of the elements necessary to convict them under § 846 and § 841(a)(1): first, that the jury could convict if the conspiracy involved "at least 500 grams" of a methamphetamine mixture; second, that the jury could convict if the conspiracy involved "more than 500 grams" of the mixture; and third, the jury verdict form gave the jury the option of convicting under "Count One of the Indictment," which they contend refers to the original indictment charging them with conspiracy involving 50 grams or more of a mixture of methamphetamine. For reasons stated above, the "at least 500 grams" language is not plain error with respect to § 841(b)(1)(A). Additionally, the district court's "more than 500 grams" language weighed in Pipers' and Cortinas's favor, as the jury could have declined to convict for an amount equal to 500 grams. Thus, their substantial rights were not affected. Finally, the jury verdict form gave the jury the option to convict Piper and Cortinas "as to Count One of the Indictment." In light of the jury instructions as a whole, and the fact that the district court described the charges set forth in the superseding indictment at trial, it is unlikely that the jury interpreted the verdict form to refer to the original indictment. *See Jones v. United States*, 527 U.S. 373, 393 (1999) ("[A]lthough the verdict forms standing alone could have [confused the jury], any confusion created by the verdict forms was clarified

when considered in light of the entire jury instruction.") (internal citations omitted).  Piper and Cortinas have failed to demonstrate plain error.

***

For these reasons, we AFFIRM.